## FEDERAL ARMORED EXPRESS, INC. ET AL.
## *v.* PUBLIC SERVICE COMMISSION OF
## MARYLAND ET AL.

[No. 48, September Term, 1974.]

*Decided December 3, 1974.*

·The cause was argued before Murphy, C. J., and Singley, Smith, Digges, Levine, Eldridge and O'Donnell, JJ.

*Charles E. Brooks,* with whom were *John Grason Turnbull, II, William N. White* and *Brooks & Turnbull* on the brief, for appellants.

*William B. Dulany,* with whom were *Dulany & Davis* on the brief, for appellee, Public Service Commission of Maryland. *Peter A. Greene,* with whom were *Macleay, Lynch, Bernhard & Gregg, Samuel B. Drue* and *Mandel, Rocklin, Franklin & Drue* on the brief, for other appellees.

Smith, J., delivered the opinion of the Court.

Federal Armored Express, Inc. (Federal), and its related corporation, Dunbar Armored Express, Inc. (Dunbar), applied to the Public Service Commission (PSC) for intrastate operating authority. Their joint application was denied. They appealed to the Circuit Court for Baltimore County. Their petition filed there in support of their appeal pursuant to Maryland Rule B2 e included a request for a declaratory decree "that the business of armored car and courier carriage as conducted by [Federal and Dunbar] and others similarly situated is not properly within the sphere of regulation of the Public Service Commission," a point pressed in their appeal here. Thus, we have the anomalous situation of their complaining because the PSC did not grant their application and yet they are saying at the same time that they are not subject to PSC control.

Federal and Dunbar have been engaged for a number of years in operating an armored car and courier business in

the Baltimore and Washington metropolitan areas. On September 6, 1972, the Director of Transportation of the PSC wrote to the President of Federal. He forwarded a copy of a memorandum from PSC's Assistant Director of Transportation concerning his investigation of a complaint made by Bonded Armored Carrier, Inc. (Bonded), an intervenor before the PSC and one of the appellees here, that Federal and Dunbar were operating in violation of the law. The president was advised that "[t]he memorandum [was] self-explanatory and indicate[d] that Federal Armored Express, Inc. [was] engaging in the intrastate movements of certain property which require[d] certification from [that] Commission under [Maryland Code (1957, 1969 Repl. Vol.)] Article 78, Section 32," and that "[s]uch intrastate transportation should be properly regulated or discontinued." It was pointed out that "[f]ailure to comply could result in infringement proceedings by the Commission as provided by Article 78, Section 100A (a)." The then counsel for Federal advised the PSC one week later that they were "reviewing [their] client's situation in the light of [that] letter and the memorandum prepared by . . . [PSC's Assistant Director of Transportation] after the complaint filed by Bonded Armored Carrier, Inc." and that counsel had "obtained the necessary [application for] permits and the same [would] be filed as and when a full determination of [their] client's position [was] completed."

On October 24, 1972, Federal and Dunbar filed a joint application "for permits to operate motor vehicles in public transportation over" certain specified routes that included a large part of the State. The requested permits were to be restricted "to the transportation of commercial papers, documents, and written instruments, including currency, and negotiable instruments used in the operations of banks and banking institutions; also, semi-processed (used) punch cards, business papers, records, and documents of all kinds used in the electronic processing and computing of business data; also film, photographic equipment and supplies, also whole human blood and blood derivatives, drugs, narcotics, pharmaceuticals and drug products." The application was

subsequently amended by the inclusion of coins among the items sought to be transported. After protests were received from other certificated carriers, the request for permission to transport film, photographic equipment and slides, whole human blood and blood derivatives, drugs, narcotics, pharmaceuticals, and drug products was deleted. Part of the application was a listing of motor vehicles for which permits were sought "to operate . . . for public use on fixed routes in the State of Maryland." Also appended was "public motor vehicle schedule of rates and fares," specifying the rate to be charged for each of the items for which authority was sought.

The matter was heard by a hearing examiner of the PSC. He filed a comprehensive report in which the evidence and the law were reviewed. He concluded that the service performed by Federal and Dunbar was *"public* transportation for hire and not other transportation for hire on regular schedules and between fixed termini" and "[t]hat with the exception of exclusive use trips all of the transportation [then] provided by [Federal and Dunbar] requires a permit from [the PSC]." (Emphasis in original.) He found that Bonded and its affiliates were "performing satisfactory service to the public under the permits issued by [the PSC] and are capable of promptly meeting such additional service requirements as may result should the Commission adopt the findings and recommendations of its Examiner in this proceeding." The Commission denied the requested permits.

Motions to dismiss this appeal have been filed by the PSC and Bonded. The motions are based upon contentions that the record extract fails to comply with the provisions of subparagraphs b and c of Rule 828 and that the appeal should have been to the Court of Special Appeals. The latter contention is made notwithstanding the provisions of Maryland Code (1957, 1969 Repl. Vol.) Art. 78, § 98 providing for appeal to this Court by an aggrieved party. The provision for review of action of the PSC in § 90 is provided by § 91 to be to "the circuit court for any county within which

operations are carried on by the public service company involved, or in any equity court in Baltimore City." Code (1974) § 12-308 (a) (13), Courts and Judicial Proceedings Article provides that the Court of Special Appeals "has exclusive initial appellate jurisdiction over any appeal" in "[a]ny action in which an appealable judgment or decree has been entered by a court of equity." It is upon this basis that it is claimed that the appeal properly should be to the Court of Special Appeals. The contention is correct, but Rule 814 provides in pertinent part:

> "When it shall appear that an appellant is or may be entitled to have an appeal heard and determined in the Court of Appeals or in the Court of Special Appeals, but not in the appellate court to which an appeal has been taken or transferred, the appeal shall not on that account be dismissed; but the case shall be transferred by an order of the court to which the appeal was improperly taken or by the Court of Appeals to the docket of the proper court, upon such terms as to payment of costs, including reasonable attorneys' fees, as the order may provide."

Since the case has been fully argued in this Court, we shall follow the procedure of our predecessors in *Moulden v. State*, 217 Md. 351, 353, 142 A. 2d 595 (1958), and treat the appeal as an application for certiorari and grant the application. Since the appellants intended from the beginning to come to this Court, we shall decide so much of the case as can be decided with the abbreviated record extract before us. Because there are issues presented here which can be decided with the abbreviated record extract, we shall not dismiss the appeal on that account.

Federal and Dunbar first ask us to determine that the PSC "does not have jurisdiction over the appellants in that they are private carriers and not common carriers."

The requirement relative to permits for "motor carrier companies" is found in Code (1957, 1969 Repl. Vol.) Art. 78, § 32 (a-1) which states in pertinent part:

"(a-1) *When permits required.* — With the exceptions enumerated in subsection (b) of this section, no motor vehicle shall be used in the public intrastate transportation for hire, or in any transportation for hire on regular schedules and between fixed termini (as these terms are defined in Article 66$^1$/$_2$, § 2) of passengers, or of property or freight . . . without a permit from the Commission to the owner, which shall prescribe the route and schedule, if any, of operation."

None of the exceptions contained in subsection (b) of § 32 are here applicable. The examiner found that the activities of Federal and Dunbar did not constitute "other transportation for hire on regular schedules and between fixed termini." Thus, to be subject to PSC regulation it must be found that Federal's and Dunbar's operations are "public intrastate transportation for hire." The scope of our review is set forth in Art. 78, § 97 where it is said that a decision of the PSC "shall be prima facie correct and shall be affirmed unless clearly shown to be (1) in violation of constitutional provisions, or (2) not within the statutory authority or jurisdiction of the Commission, or (3) made upon unlawful procedure, or (4) arbitrary or capricious, or (5) affected by other error of law, or (6) if the subject of review is an order entered in a contested case after hearing, such order is unsupported by substantial evidence on the record considered as a whole."

The term "public intrastate transportation for hire" is not defined in Art. 78, but § 2 of that article defines "common carrier" as "any person . . . *engaged in the public transportation for hire* of persons, property or freight . . . ." (Emphasis added.) It will be recalled that reference was made to a "public service company" in § 91 which section provides where an appeal should be docketed. The definition of "public service company" in § 2 (o) is:

"(o) *'Public service company'* means a common carrier company, gas company, electric company, steam heating company, telephone company,

telegraph company, water company, sewage disposal company, and/or any combination thereof. Two public service companies shall be considered of the same class, where they are both common carrier companies or both gas companies, electric companies, gas and electric companies, steam heating companies, telephone companies, telegraph companies, water companies or sewage disposal companies."

The Public Service Commission was created by Chapter 180 of the Acts of 1910. By Chapter 610 of the Acts of 1916 the PSC was granted the right to regulate motor vehicles used in the public transportation of passengers for hire, the provision becoming Code (1912) Art. 56, § 189. *Smith v. State*, 130 Md. 482, 483, 100 A. 778 (1917), construed this provision as "relating to the licensing of motor vehicles used as common carriers." It also said:

"The distinction is sought to be drawn on the basis of definite route and an established schedule. This ground is not tenable. The intent of the legislative enactment is perfectly clear. What that body was attempting to do, was to distinguish as between motor vehicles operated as common carriers, and those not regularly so operated; the former would be subject to the provisions of Chapter 610; the latter governed by the provisions of Chapter 687." *Id.* at 485.

This provision of the Code was again before the Court in *Towers v. Wildason*, 135 Md. 677, 109 A. 471 (1920). By that time the Act of 1916 had been amended by Chapter 199 of the Acts of 1918. Under that law it was "the duty of each owner of a motor vehicle to be used in the public transportation of passengers for hire operating over State . . . roads . . . in the State of Maryland to secure a permit from the Public Service Commission of Maryland . . . ." Wildason lived near Bel Air in Harford County and was employed at Aberdeen Proving Ground. He was in the habit

of transporting five of his fellow employees to their place of employment in the morning and bringing them back in the evening "for a definite compensation per week." He had taken out a "hiring license" from the Commissioner of Motor Vehicles. The PSC brought suit to enjoin him "from operating one or more motor vehicles in the public transportation of passengers for hire from the town of Bel Air, in Harford County, . . . to the town of Aberdeen, in said county . . . over any State . . . road . . . without first having secured a permit so to do from the Public Service Commission of Maryland . . . ." Judge Thomas for our predecessors referred to the language used in *Smith* and said:

> "With this construction of the two Acts of 1916, it is apparent that unless the use the defendant made of his car brought him within the definition of a common carrier he was not subject to the provisions of Chapter 610. Chapter 180 of the Acts of 1910 (Sec. 413 of Art. 23 of the Code of 1912), declares that the term 'common carrier' shall include all railroad corporations, etc., 'and all persons and associations of persons, * * * operating such agencies for public use in the conveyance of persons or property within this State,' and Section 1½ of Chapter 445 of the Act of 1914 (Section 413-A of Art. 23, Vol. 3, of the Code), provides that 'The term "common carrier," * * * shall likewise include all automobile transportation companies, and all persons and associations of persons, whether incorporated or not, operating automobiles or motor cars, or motor vehicles, for public use in the conveyance of persons or property within this State.' It is clear from the evidence in the case that the use that the defendant made of his car did not constitute him a common carrier as that term is defined by the statutes referred to. He did not operate his car 'for public use,' but only for his use and the use of the five men we have named." *Id.* at 682-83.

*Towers* must be placed in the context that language similar to that found in § 32 (a-1) relative to "transportation for hire on regular schedules and between fixed termini" did not come into the Maryland law until 1927 with the enactment of Chapter 152 of the Acts of that year.

The same sections of law considered in *Smith* and *Towers* were before the Court in *Goldsworthy v. Pub. Serv. Comm.,* 141 Md. 674, 678, 680, 119 A. 693 (1922). There the owner of a "passenger truck," Goldsworthy, entered into a contract with Buckell by which Buckell hired the truck for the purpose of transporting such persons as Buckell might desire. Goldsworthy agreed to transport any and all persons designated by Buckell to a number equal to the capacity of the truck. Transportation was between two points in Allegany County. The PSC brought suit against Goldsworthy and Buckell to restrain their operation of the motor vehicle for the public transportation of passengers without first obtaining a permit. The Court indicated that the question before it was whether or not Buckell and Goldsworthy were common carriers.

The same statute was again before the Court in *Restivo v. Pub. Serv. Comm.,* 149 Md. 30, 129 A. 884 (1925). Restivo had previously operated a bus business which he sold to Blue Ridge Transportation Company. Shortly after that sale he began to run certain buses and cars over the same route on Sundays. The PSC advised that he was violating the "Public Passenger Motor Vehicle Law" and that if he did not cease his operations he would be arrested by the state police for the violation. Restivo thereupon filed a bill in the Circuit Court of Baltimore City seeking to enjoin the PSC and the Commissioner of Motor Vehicles from preventing him from operating his "busses and ... touring cars" and "from interfering in any way with the said plaintiff or with the said busses and touring cars or with the agents and servants of the plaintiff in operating said busses and touring cars." Judge Walsh indicated for this Court that the question to be decided was whether Restivo was a common carrier, adding:

> "It is difficult to determine with exactness just when the owner of a motor vehicle is operating as a

common carrier, as that term is ordinarily understood in the law, but the courts have not been inclined to excuse the increasing number of those who earn their livelihood by transporting persons or goods for hire in motor vehicles, from the responsibilities of common carriers simply on technical grounds, and they have been particularly slow to excuse them when their plan of operation bore evidence of being a studied attempt to reap the rewards of common carriers without incurring the corresponding liabilities." *Id.* at 34-35.

In *Pub. Serv. Commn. v. West. Md. Dairy*, 150 Md. 641, 135 A. 136 (1926), the Court was concerned with what was then Code (1924) Art. 56, § 258, originally enacted by Chapter 714 of the Acts of 1916, making it "the duty of each owner of a motor vehicle to be used in the public transportation of merchandise or freight, operating over State . . . roads . . . in the State of Maryland, to secure a permit from the Public Service Commission of Maryland, to operate over said roads and streets . . . ." The dairy collected milk from various farmers and transported that milk to its dairy in Baltimore. It claimed that it was not required to obtain a permit because it was engaged in the *private* transportation of its own milk. The Court held the ownership of the milk was in the producers while in transportation and thus subject to PSC regulation. In the process it quoted the language we have quoted above from *Restivo.*

It will be recalled that the PSC examiner found that the activities of Federal and Dunbar did not constitute "other transportation for hire on regular schedules and between fixed termini," with which findings Federal and Dunbar are in full agreement. Bearing this in mind and also bearing in mind the definitions we have quoted from the statute and the interpretations placed by our predecessors· upon identical language relative to "public transportation for hire" appearing in the statutes which preceded the present § 32 (a-1), we hold that for Federal and Dunbar to be subject

to PSC regulation it must be found that they are common carriers.

In passing upon this point we are faced with the stark fact that not one iota of the evidence before the PSC has been printed in the record extract. That extract has been limited to the report of the hearing examiner, the PSC order, the order for appeal to the circuit court, the petition in support of appeal there, and the chancellor's opinion. Thus, without resort to the voluminous PSC record, we are left in the position of not having before us a basis for determining whether the operation of Federal and Dunbar is "within the statutory authority or jurisdiction of the Commission" or for a determination of the validity of the contention of Federal and Dunbar that the order here "is unsupported by substantial evidence on the record considered as a whole." As far back as 1948, Judge Henderson commented for the Court in *Platt v. Wilson*, 191 Md. 371, 62 A. 2d 191 (1948):

> "We have indicated in several recent cases that this court will not undertake to pass upon testimony contained in the transcript, but not printed in an appendix to the brief, as contemplated by rule 39 of this court, so as to be available to each member of the court." (Citations omitted.) *Id.* at 373.

In *McIntyre v. Byrne*, 217 Md. 71, 141 A. 2d 692 (1958), Judge Prescott said of Rule 828:

> "The Rule is clear, definite and certain; there is little excuse for having an attorney's compliance therewith questioned, much less to have it closely challenged. The substantial rights of litigants to have judgments and decrees reviewed upon appeal should not be jeopardized by the possibility of failing to comply, or reluctance to comply, with a Rule so easy to follow." *Id.* at 74.

More recently, in *State Roads Commission v. Sharper*, 231 Md. 411, 190 A. 2d 647 (1963), Judge Marbury said for the Court:

> "Maryland Rule 828 b 1 specifies that the printed

extract *shall* contain such parts of the record reasonably necessary for the determination of questions presented on appeal. It is noted that this section is a mandatory requirement." *Id.* at 413. (Emphasis in original.)

There is no shortage of pronouncements on this subject by this Court. *See, e.g., Caroline v. Reicher,* 269 Md. 125, 137, 304 A. 2d 831 (1973); *A. S. Abell Co. v. Skeen,* 265 Md. 53, 58-59, 288 A. 2d 596 (1972); *Basiliko v. Royal Nat'l Bank,* 263 Md. 545, 549, 284 A. 2d 227 (1971); and *Walsh v. Lewis Swim. Pool Constr.,* 256 Md. 608, 617, 261 A. 2d 475 (1970). From the meager record extract printed we are unable to say whether there is evidence from which the PSC could have found Federal and Dunbar to be common carriers. Therefore, we do not have a basis for determining whether the chancellor or the PSC erred in determining that these corporations were engaged in "public intrastate transportation for hire . . . of property or freight."

The second contention of Federal and Dunbar is that "the decision of the Public Service Commission [refusing to grant the desired permits] is clearly erroneous and contrary to the substantive evidence." They point out that they "and protestants below have been in business for almost twenty years and their businesses have expanded with the growth of the banking institutions and other businesses and the need for transportation of commercial paper, documents and other business data" and that "[t]he question here is not strictly speaking [that of an application] for a new certificate, but merely to comply with the requests of the Public Service Commission so as to avoid any possibility of violation of the law."

Federal and Dunbar are not entitled to any special consideration because of their prior operation. Their contention here is but little different from that which was before the Court in *Clark v. Pub. Serv. Commission,* 209 Md. 121, 120 A. 2d 363 (1956). Clark had held a certificate for many years from the Interstate Commerce Commission authorizing him to transport general commodities in

interstate commerce over designated regular routes between Baltimore and Washington. He was also authorized to give service to and from all intermediate points and the off-route points of Fort George G. Meade, Gambrills, Millersville, and Odenton in Maryland. He admitted that for 11 years he hauled freight from Baltimore to Annapolis, not only by way of Washington as authorized by the ICC, but also by direct route. In 1952, on advice of counsel, he discontinued intrastate operations. He then gave his drivers instructions to cross into the District of Columbia before going to Annapolis, thinking, so it was said, that he was thereby complying with his certificate from the ICC. The Public Service Commission held that Clark should not be allowed to convert intrastate commerce into interstate commerce by merely crossing the state line. This Court affirmed. Before our predecessors at the same time was Clark's application for a permit to operate as a carrier of freight between Baltimore and Annapolis over Maryland Route 2. He produced witnesses, including the county manager of Anne Arundel County, who testified that his service had been satisfactory and who recommended that he be granted a permit. The application was opposed by competitors. Judge Delaplaine said for the Court:

"In this case the evidence failed to show that the service furnished by City Express, Inc., was inadequate or unsatisfactory. The testimony of Barker, its general manager, was uncontradicted that there had been no complaint of its service. His testimony was also uncontradicted that it had ample equipment to carry all freight to Annapolis and intermediate points. He said that the company had 32 trucks, 39 trailers, 40 tractors, and 11 company and service cars. In addition, its rates have been about 10 cents per 100 pounds lower than appellant's rates.

"As the evidence in this case did not show that the order of the Commission was arbitrary or unreasonable, but on the contrary was sufficient to support the finding that City Express, Inc., was

furnishing the public adequate and satisfactory service, the order of the Court below dismissing appellant's bill must be affirmed." *Id.* at 133.

Thus, any claim for special consideration here because of the prior activities of Federal and Dunbar must fall. Any contention that the PSC erred otherwise in not granting the requested permits likewise must fail because we have not been supplied in the record extract with any evidence which was before the PSC. Therefore, we have no basis for making a determination that the PSC's order was unsupported by substantial evidence on the record considered as a whole.

Federal and Dunbar next contend that "the failure to permit the appellants to continue to operate as private carriers or to grant them a permit so that their established business will continue is a denial of the due process of law." This in essence amounts to an argument that if one operates without PSC authority long enough, then the PSC is bound to grant authority if one applies for it, possibly something akin to a prescriptive right. We are unable to subscribe to such a proposition. The contentions made on behalf of Federal and Dunbar are similar to those made on behalf of Restivo, Western Maryland Dairy, and Clark, all of which our predecessors found to be without merit. In *Salisbury Beauty Schools v. St. Bd.*, 268 Md. 32, 63, 300 A. 2d 367 (1973), we said that "[a]lthough it is recognized that estoppel may operate against the State by acts done in its proprietary capacity, the doctrine of estoppel will not be applied against the State in the performance of its governmental, public or sovereign capacity or in the enforcement of police measures." The position in which Federal and Dunbar find themselves differs but little from that of parties in zoning cases in which we have held that the doctrine of equitable estoppel would not apply. *See City of Hagerstown v. Long Meadow*, 264 Md. 481, 495, 287 A. 2d 242 (1972), and *Kent County v. Abel*, 246 Md. 395, 399, 403, 228 A. 2d 247 (1967), and authorities cited in each.

> *Motions to dismiss denied; decree affirmed; appellants to pay the costs.*