FLEMING ET AL. *v.* PRINCE GEORGE'S
COUNTY ET AL.

[No. 148, September Term, 1975.]

*Decided May 19, 1976.*

656

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*William E. Brooke* for appellants.

*William N. Zifchak*, with whom were *James P. Salmon* and *Sasscer, Clagett, Channing & Bucher* on the brief, for Prince George's County, one of appellees. *William A. Ehrmantraut*, with whom were *Donahue & Ehrmantraut* on the brief, for Frederick H. Wilhelm, M.D., one of appellees. Submitted on brief by *John L. Ridge, Jr.*, for William D. Rosson, M.D., other appellee.

SMITH, J., delivered the opinion of the Court. MURPHY, C. J., concurs in part and dissents in part and filed an opinion concurring in part and dissenting in part at page 686 *infra*.

Appellants, Ennis R. Fleming *et al.* (Fleming), sued Prince George's General Hospital, Inc. (the Hospital), Prince George's County, Dr. William D. Rosson (Dr. Rosson), and Dr. Frederick H. Wilhelm (Dr. Wilhelm), alleging that the negligence of the defendants was responsible for injuries sustained by Orpha E. Fleming on May 18, 1973, and her ultimate death on June 17, 1973. Plaintiffs included her husband, Ennis R. Fleming, her daughter, and the personal representative of her estate. A trial judge granted a directed verdict in favor of the defendants at the end of all of the evidence. We granted the writ of certiorari prior to consideration of the matter by the Court of Special Appeals. We shall reverse.

It is contended the trial court erred in ruling that there was no evidence upon which the jury could have determined that there was negligence and that it also erred in four instances in its rulings upon the evidence. We shall develop the relevant facts as we consider each point.

## I — Negligence

### a. The Law

In considering the propriety of the grant of the motion of the defendant for a directed verdict we are obliged to resolve all conflicts in the evidence in favor of the plaintiffs and to assume the truth of all evidence and such inferences as may naturally and legitimately be deduced therefrom which tend to support the right of the plaintiffs to recover. *Taylor v. Armiger,* 277 Md. 638, 358 A. 2d 883 (1976), and cases there cited.

The standards by which a physician and a hospital are to be judged in cases such as this were recently enunciated by Judge Levine for this Court in *Shilkret v. Annapolis Emergency Hosp.,* 276 Md. 187, 349 A. 2d 245 (1975):

> "[A] physician is under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances. Under this standard, advances in the profession, availability of facilities, specialization or general practice, proximity of specialists and special facilities, together with all other relevant considerations, are to be taken into account." *Id.* at 200-01.

> "[A] hospital is required to use that degree of care and skill which is expected of a reasonably competent hospital in the same or similar circumstances. As in cases brought against physicians, advances in the profession, availability of special facilities and specialists, together with all other relevant considerations, are to be taken into account." *Id.* at 202.

### b. General Facts

Dr. Rosson had been the family physician for the Flemings for about 11 years prior to the incident in question. He and Dr. Wilhelm had a mutual agreement to cover calls

for each other. Mrs. Fleming had been treated by Dr. Rosson for a lung condition. On May 11, 1973, she was seen by Dr. Rosson in his office. At that time she complained of nausea, fatigue, weakness, and a pain in her lower back. Mrs. Fleming was then approximately 67 years of age.

On May 13, 1973, Mrs. Fleming was admitted to Prince George's County Hospital with congestive heart failure, lung disease, and hypertension. Dr. Wilhelm was the admitting physician. He was covering calls on that day, a Sunday, for Dr. Rosson.

On May 14, Dr. Rosson prescribed Librium, in doses of 10 mgs, three times per day, after she complained of nervousness and anxiety. Mrs. Fleming had been on a prescription of Librium since October 1972 with the same prescribed dosage. Although the nurses' records report that she was periodically disoriented, such behavior was not observed by her attending physician until May 17, 1973, despite daily contact. At approximately midnight on that day she was found walking the corridor of the hospital with a sheet over her and waving a dinner knife. The nurses on duty were unable to persuade her to return to her room. She struck at them with the knife. Dr. Rosson arrived and attempted to get her back into her bed. She resisted, gesturing at him with the knife. She then went down to the main lobby where she attempted to leave the hospital. The security guards brought her back, a Posey vest restraint was ordered for her, and Valium, 5 milligrams was administered at 12:20 a.m. on May 18 by order of Dr. Rosson. He also wrote an order that she should be watched carefully and that all sharp instruments should be kept away from her.

Sometime later the patient was still restless and unable to sleep. Consequently, Nurse Decker placed a phone call to Dr. Rosson. The answering service contacted Dr. Wilhelm's home. Nurse Decker told Dr. Wilhelm of the earlier incident and that the patient was still quite restless. She also told him that Mrs. Fleming had been placed in restraints and had been administered the dosage of Valium prescribed by Dr. Rosson. At 3:25 a.m., Dr. Wilhelm prescribed 50 milligrams

of Seconal to be given intramuscularly immediately. If that was not effective after one hour she was to receive 5 milligrams of Valium intramuscularly. He also ordered the taking of her vital signs as often as possible and directed that all her meals be served with plastic flatware. The Seconal injection was administered. When Nurse Decker checked ten minutes later Mrs. Fleming was apparently resting quietly.

At approximately 4:00 a.m., 10 minutes after Mrs. Fleming was last checked upon, the nurses discovered that she was absent from her room. They began to search for her. Subsequently, a sheet was seen hanging out of the window of her room. Investigation revealed that the patient had apparently attempted to escape from the Hospital through the window. She had fallen several floors to her severe injury.

Dr. Harold L. Hirsh was called as an expert witness by Fleming. Dr. Hirsh was licensed to practice medicine in the District of Columbia in 1943 and had practiced since that date. He was licensed in Maryland in December 1969. Dr. Hirsh is a specialist in the field of internal medicine, being a diplomate of the American Board of Internal Medicine. Dr. Hirsh described himself as familiar with the standards of care and skill required of physicians and hospitals in Prince George's County in May 1973. His qualifications were accepted by the trial court and are not challenged on appeal.

### c. Negligence of Dr. Rosson

Dr. Hirsh testified that it was his "opinion, with reasonable medical certainty, that [Dr. Rosson] failed to meet the standard of care under the circumstances, one, in [Mrs. Fleming's] pre-hospital evaluation; second, during the course of her hospital stay, her ongoing evaluation. [He] th[ought] that [Dr. Rosson] did not meet the standard of care on the night of the 17th," the night that she jumped or fell to her ultimate death.

Dr. Hirsh said:

"Dr. Rosson testified that Mrs. Fleming was

cantankerous, was not complying with his request, . . . or with his advice . . . . Did not do what he had advised her to do. Did not keep her appointments, terminated her appointments frequently without getting what she came for, and apparently felt a great deal of distress and frustration about that.

"It is a well-known medical fact that elderly people who become obstinate and stubborn and cantankerous frequently are manifesting one of two things: One of them is that they are developing some cerebral arteriosclerosis, some senility is a common term, or maybe a manifestation of depression. These are well-known medical facts.

"I think that Dr. Rosson fell below the standard of care when he merely assumed her behavior was due to obstinacy or stubbornness and did not, at that point, investigate or try to find out whether, in fact, this was purely her personality or whether, in fact, this represented some medical emotional change. And in any event, even if it turned out to be a personality problem, I think that he failed to take appropriate action in overcoming it, to the patient's detriment.

"So that I did not hear him testify that he had talked to her husband or to other members of her family trying to get them to understand how important it was for them to try to get her to conform to the treatment to—to what she was supposed to do."

He thought the proper standard would have required Dr. Rosson to ascertain whether this was a personality problem or whether it represented some medical condition which might respond to treatment. Also, Dr. Hirsh said, "[K]nowing that she was obstinate or cantankerous for whatever reason, to her detriment," then Dr. Rosson "should have taken other measures. Whether they would have been successful or not we don't know, but in any event he did not

undertake to do something more about it, by enlisting her husband's aid or perhaps other members of the family."

Dr. Hirsh pointed out that the nurse's notes stated that on May 14 "the patient was nervous and apprehensive," after which Librium was prescribed by Dr. Rosson in the amount of 10 milligrams, three times a day, at 10:00 in the morning, 2:00 in the afternoon, and 6:00 at night. Dr. Hirsh was of the opinion that giving Librium "in this concentrated form over a limited period of hours did fall below the standard of care." He said that "we know that it's not rare, it's infrequent, that you will get mental disturbance with the use of a drug like Librium, that when [Dr. Rosson] saw these symptoms . . . on the nurses' notes, rather than continue to attribute them to her personality, it was at that point that [Dr. Hirsh] felt that [Dr. Rosson] failed to ascertain it was the Librium, in fact, responsible for her agitation and confusion, because she didn't have it on the first day when she wasn't getting her Librium."

Relative to the night of May 17 and the morning of May 18, Dr. Hirsh said:

> "[Dr. Rosson] fell below the standard of care in management of Mrs. Fleming while he was there. I think that, having been on the scene and having been attacked, although feebly, that when Mrs. Fleming escaped, so to speak, and when she was brought back, that because this represented a marked departure from her behavior before, that rather than play, what I would call, an armchair role that he should have examined Mrs. Fleming because he may have found that something had occurred which could explain her behavior which he might have been able to treat medically.
>
> "Now, Dr. Rosson rightfully considers that Mrs. Fleming was hostile to him at that time and that he might very well aggravate her. But, at the same time, there are other physicians. Dr. Wilhelm could have been called, he was available, and there are house officers. And I feel if he wanted to exclude

himself because he didn't want to aggravate her or agitate her anymore, then he should have gotten another physician to examine her. But I think that examination was in order. I don't think that he could have depended on what happened before and — as a matter of fact, the last examination that we have a record of is three days or two days earlier, on the 15th.

"So that I feel that he should have examined her, and in addition to that I think that he fell below the standard of care in ordering more Valium. Because, again, he failed to consider that the Librium was the source of her problem. And all he was doing, in fact, was giving her another drug similarly related chemically, similarly acting pharmacologically.

"And the other thing is since Mrs. Fleming had apparently gotten out of the restraints, I think that he or someone with comparable experience and expertise and knowledge should have seen what was going on with the restraints, whether they were, in fact, being properly applied and whether they were properly applied. And, again, if he is unwilling to do that, then I think that he should have gotten someone to act as a surrogate.

"Q. When you say 'improperly' or he should have seen that they were properly applied, are you relating to the physician like or would there be instructions that would go with that? A. Well, I actually have difficulty with allowing restraints to be used at this particular point. Dr. Rosson does indicate that he worried about using restraints, and that it may have been that the restraints were aggravating and agitating her.

"So that at this point I think he should have removed all things which might have been offensive to her, so to speak, and one was the restraint, and to secure competent help that could sit with her and — rather than imposing restraints.

But if, in fact, he felt that it was impossible to do that, for one reason or another, then since he was already going to use restraints then I think that half-way measures, just using the Posey and vest, were inadequate and he should actually have had her — her arms restrained.

"Now, that is not the most desirable, but on the other hand when you are in a difficult situation you have to do the best under the circumstances, and that may have been the best under the circumstances. But none of these other alternatives were tried. He lets the nurse put her back in bed. The nurses and two attendants who brought her back from the emergency room strapped her down.

"And not only that, but certain things they did, other things they claimed they couldn't do. They didn't take her purse away from her, they didn't take other objects away from her."

Dr. Rosson was not to be available after midnight on the 17th. Dr. Wilhelm, pursuant to their usual arrangements, was to take care of his patients. Relative to this Dr. Hirsh said:

"I think the standard of care would require that if Dr. Rosson was not going to be on call for this patient for the rest of the night that he should have communicated directly with Dr. Wilhelm and told him what had transpired and what he had done, so that if there was any further problem Dr. Wilhelm would be well informed as to what Dr. Rosson's opinion was, what he had done, why he had done it, so that Dr. Wilhelm would know as much about this situation as he should or could."

The opinion of Dr. Hirsh as to the cause of death was set forth in the record:

"Q. Now, he also stated he gave her an amount of Librium which you felt, under these circumstances, failed to meet the standard of care, and that you

felt that as a result of this, this condition brought about — I would like to ask you whether or not, by assuming that this brought about this condition, the giving of this medication was a — has a causal connection with her tragic condition? A. I think it was the immediate or direct cause of her death.

"Q. Why would you say that? A. Well, I think that Mrs. Fleming became confused, agitated, disoriented, hostile, aggressive, and as a result of that could not be contained or restrained and ultimately did free herself from her bond. She did not really appreciate, I am sure, what she was doing, was psychotic to the extent she felt she had to go home when, in fact, she shouldn't have gone home she was too sick. And then, obviously, not knowing where she was, not, I am sure, appreciating she was on the seventh floor, decided to let herself out of the window, and she would have required a great more apparatus to get out.

"So that I think this agitation, this confusion, this disorientation ultimately caused her to want to escape, so to speak, from something that was actually to her betterment."

The record further reflects:

"Q. Doctor, you also stated in your opinion he fell below the standard of care by not consulting with a psychiatrist. Are you able to state, in your opinion, with reasonable medical certainty, as to whether the failure to do this was a causal factor contributing to her death? A. It's my opinion that it was, yes."

Dr. Hirsh summarized relative to the acts of Dr. Rosson:

"Q. Doctor, during the course of your testimony you have described various acts on the part of the two doctors and on the part of the hospital that you stated caused the death of Mrs. Fleming. Would

you explain to the jury why it is that you feel that all of these acts caused it?

* * *

"(The Witness) I think that in the beginning that Dr. Rosson set in motion a whole series of events which continued and at various times he might have had the opportunity to stop them and, at any point, the tragic event could have been avoided.

"I think starting her on the Librium and not considering the impact of the Librium, not having considered the impact of the Dyazide, not having made notes, not having personally supervised her care when she was returned from the emergency room, not having sought adequate consultation, not having conferred with Dr. Wilhelm or advised him of the circumstances. I think all of these things ultimately — and at different times there was opportunity for him to have intervened and stopped the course of events that ultimately resulted in her leaving the room through the window and die ultimately."

### d. Negligence of Dr. Wilhelm

The record relative to the examination of Dr. Hirsh as to the negligence of Dr. Wilhelm is:

"Q. What would have been the proper standard of care, and how was there a failure of that? A. I think Dr. Wilhelm, in order to conform to the standard of care, should have been in personal communication with Dr. Rosson to try to find out what had happened to this lady in the last five days since admission so that he could more fully appreciate what the problem was and then render more appropriate treatment.

"I think by failing to find out he relied on the description of a nurse, which . . . led him to make certain conclusions. I think in this kind of case,

under these circumstances, not having an on-going familiarity, that he should have talked to Dr. Rosson. He knew nothing of what went on from the night he wrote her original orders. And his orders . . . that day that he admitted her, I think, were well within the standard of care. But I think that when the nurse communicated with him, whichever way it was, that at that point he was obligated to get in touch with Dr. Rosson.

"Q. Assuming the correctness of his testimony that the nurse did not tell him about these various incidents, but did tell him the patient . . . needed a sedative and trying to get out of the Posey restraint, and considering the time of the call, and considering his testimony that he did not feel that it was necessary to make inquiry concerning her condition, do you have any opinion as to whether that met the standard of care? A. I think it fell below the standard of care because Dr. Wilhelm testified on the night of the admission, or the day of admission Mrs. Fleming was less concerned about herself than Mr. Fleming, and then on the night that he is called about her she is trying to get out of the restraints, and I think that . . . a physician under these conditions would want to know why is this patient in a Posey restraint, what happened from this docile, unconcerned woman to someone who is in restraints. And either he should have questioned the nurse more fully — but I think that to get more accurate, more reliable, more expertise or expert information, I think he should have called Dr. Rosson.

"Q. What about the conversation with the nurse, should he make further inquiry of the nurse? A. I think he should have queried her more specifically, more extensively to try to find out from the nurse what had transpired during these past few days.

"Q. And had he made these inquiries and ascertained the facts as they have been brought out

to the evidence, and assuming that the incidents as described in the medical records are true, do you have an opinion as to what the standard of care would have required of him in terms of taking action on behalf of the patient? A. Well, I think if he had to find out all the things that had transpired he should have come to the hospital and examined her or had a house officer examine her. I think we are talking in terms of getting the greatest amount of information and to find out whether it is a medical problem and again get consultation from a psychiatrist, under the circumstances. He really can't read his mind, but it certainly seems reasonable if he had known what had transpired he would have seen a great change in this woman.

\* \* \*

"I think — as to Dr. Wilhelm, I think that when he received the call from the hospital, or when he was in contact with the hospital, that particularly he failed to get a complete history at that time so that he would be fully aware of what was going on. And he failed to inquire either of the nurse if, in fact, she did not tell him, nor did he communicate with Dr. Rosson.

"So that he treated this simply as a simple case of a woman being upset and agitated and did not either talk to Dr. Rosson or didn't personally intervene by going there to see what was happening or what had happened and . . . read the chart and see what was going on. And as a result of that I think that his orders were inadequate.

"If the Seconal did not contribute to her agitation it certainly didn't relieve it, obviously, and so again he had the opportunity to call a psychiatrist. But I think his failure to inform himself and his failure to act on that, on the proper information, again resulted in Mrs. Fleming's activity and her death."

### e. Negligence of the Hospital

Relative to the negligence of the Hospital Dr. Hirsh said:

"I feel that the nurses fell below the standard of care in not conveying to Dr. Rosson more forcibly their opinion as to her emotional or mental problem. They were reporting her being agitated, confused, and disoriented, and yet no action was taken by Dr. Rosson to that extent, and I think at that point it requires the nurse and physician to communicate to get their signals straight.

\* \* \*

"I think it may have been appropriate for the nurses to apply the Posey or the restraint at that time without a specific physician's order if they felt that that was absolutely required. But once having done that to secure the patient, I don't think that . . . it meets the standard of care for that device to be continued . . . without the consent and approval of a physician.

"As a matter of fact, there has been voiced here some concern whether restraints had not aggravated her. I don't think that applying restraints on a continuous basis falls within the expertise of a nurse.

\* \* \*

"As far as the hospital is concerned, I think that on the basis of what the nurses did, putting on restraints without permission, without approval, not restraining her adequately and properly, not supervising her properly, not taking away things which had become dangerous instruments, not communicating with the husband, not securing other proper help, I think all of these things, in my opinion, caused Mrs. Fleming's ultimate death."

### f. Summary Relative to Negligence

It will be seen that in the opinion of Dr. Hirsh both physicians and the Hospital failed to meet the standards required of them under our opinion in *Shilkret*. Obviously, the jury would have been free to believe only a portion of the testimony of each side. *Racine v. Wheeler*, 245 Md. 139, 144, 225 A. 2d 444 (1967), and *Md. Chemical v. Monn*, 241 Md. 127, 130, 215 A. 2d 731 (1966). However, resolving all conflicts in the evidence in favor of the plaintiffs and assuming the truth of all evidence and such inferences as may naturally and legitimately be deduced therefrom which tend to support the right of the plaintiffs to recover, there was sufficient evidence here to warrant submission of the case to the jury. Accordingly, the trial judge erred.

### II — Exclusion of Evidence

Fleming takes issue with the rulings of the trial judge in certain instances in excluding evidence. Since there must be a new trial we consider those points for the guidance of the trial court upon the remand.

### a. Alleged Inconsistent Statements of Nurse Decker

Mary Theresa Decker, the nurse in charge of the area of the Hospital in which Mrs. Fleming was a patient at the time of the unfortunate incident leading to her death, was called as a witness by Fleming. There was an initial attempt to have her deemed an adverse witness pursuant to Code (1974) § 9-113, Courts and Judicial Proceedings Article, it being claimed that she was the "managing agent of a corporation, partnership or association" (the Hospital) within the meaning of the statute by virtue of her supervisory position. The trial court ruled to the contrary. No issue has been taken on this appeal with that ruling.

Mrs. Decker testified as to the knife incident and to the return of Mrs. Fleming to her room. The record then is:

"Q. What did Dr. Rosson do at that time? A. Well, he sees all his patients most of the time around that time. He tried talking to her and he

gave us orders, as they were described, what was carried out.

"Q. Did he talk to her after she was brought back? A. I believe so."

An attempt was then made to confront Mrs. Decker with her deposition. When an objection to this was sustained the following took place at the bench out of the hearing of the jury:

"(Mr. Brooke) I would like to state for the record on Page 38 of the deposition — she has completely changed her testimony, and I believe in view of this she could be declared a hostile witness. She previously stated, under oath, at Page 38, 'Did Dr. Rosson come in and examine the patient? Answer: Well, I wasn't watching Dr. Rosson, I was busy. He might have went in to talk to her. Question: And you don't know whether he did or not then? Answer: No, I don't.' That was her statement.

"(The Court) Very well. You can't impeach your own witness. This is your own witness. We don't think the answer is to the extent that you indicate.

"(Mr. Brooke) I would like to request she be declared a hostile witness at this time, your Honor.

"(The Court) No. It will take a whole lot more than that.

"(Mr. Brooke) For the record, your Honor, when she was testifying at her deposition she made certain statements that I assume were correct. If she is going to repudiate her statement I would like to point that out.

"(The Court) We can only take care of those things as we come to them, Mr. Brooke."

Mrs. Decker was questioned relative to various items removed from the possession of Mrs. Fleming. The record relative to eyeglasses was as follows:

"Q. . . . Was another object discovered in her

possession at a later time? A. One time or another we would try to confiscate everything from her. We even put everything in the hallway, all the tables.

"Q. When you say 'everything,' what was the next thing you observed in her possession? A. The eyeglasses.

"Q. The eyeglasses, you observed them? A. She wouldn't give those up off her eyes.

"Q. Was she wearing them on her eyes? A. Right."

This provoked another colloquy at the bench. It was proffered that a question and answer on the deposition was as follows:

"At this time did she have her glasses? Answer: I couldn't see because she had blankets over her and underneath she had her purse and other stuff."

Counsel for the Hospital suggested that the nurse was "talking about a different time." The trial judge agreed that "[i]t could be a different time." Permission to read the deposition was requested and denied.

Mrs. Decker said that a teaspoon and "a Nylon hair brush with the end broken off," the handle of which was made of "Nylon," said to be, "Hard plastic. White plastic," with a sharp point was taken from Mrs. Fleming by one of "[t]he other nurses." The record then is:

"Q. What was she doing with that? A. Well, we didn't see her doing anything with it.

"Q. Did you ever see her fraying the restraint with it? A. Well, we assumed perhaps she was going to try to do that.

"Q. Did you observe her doing it? A. No. The other nurses might have mentioned it."

The record than reflects the following at the bench:

"(Mr. Brooke) On Page 60-61, 'Answer: She kept on working at the Nylon part of that vest restraint

with the hair brush. Question: And working in what way? Answer: In trying to tear it.'

"(The Court) It could have been some information she had gotten from some other witness. As I see it, there's been no objection, but you are leading, you are treating this witness just as if you were cross-examining her. It's wrong. If they don't object, I assume they will let you have all the rope you want.

"(Mr. Brooke) I feel she is really allegedly the person who was negligent. I feel she is in fact hostile.

"(The Court) Very well."

Upon the return of counsel to the trial table the record reflects:

"Q. Was there evidence to you where she had frayed the restraint? A. I didn't see it.

"Q. You did not see the restraint that had been frayed? A. Not after the hair brush incident.

"Q. What did you see then? A. I didn't see anything after the hair brush incident.

"Q. Did you see the restraint? A. It was intact at that time.

"Q. Was it frayed at that time? A. No, sir.

"Q. Did there come a time when you observed the restraints had been torn and frayed? A. After she got out of bed.

"Q. What about ten minutes before she got out of bed, did you go in there then? A. Yes, sir.

"Q. What did you observe at that time? A. Well, she had quieted down. She was apparently trying to rest and I did not want to disturb her. I thought the best thing for her in her condition was to keep her quiet.

"Q. Was her purse in her lap at that time? A. I cannot recall.

"Q. Was there a cover over her lap at that time? A. Yes, sir.

"A. Was there movement under the cover? A. Not at that time.

"Q. Had you seen movement under the cover at other times? A. Other times when we were going in there to quiet her down when she would be yelling, yes.

"Q. What would you see? A. Just movement.

"Q. Directing your attention to the point ten minutes before she was gone. You went in and saw her at that time, is that right? A. Yes, sir.

"Q. At that time was she sitting in there with her purse in her lap?

"(Mr. Farrington) He already asked this question and she responded.

"(Mr. Brooke) I would like to approach the bench one more time. I don't want to overdo this, but I do feel —

"(Whereupon, counsel approach the bench and the following proceedings were had out of the hearing of the jury:)

"(Mr. Brooke) Your Honor, we do have her, ten minutes prior to Mrs. Cranford finding her, she had gone in there and she was questioned on it and she was asked, 'Was the back of the bed tilted up or laying flat in bed? Answer: It was straight up because of her breathing. Question: She was sitting there with the purse in her lap with the blanket over her lap? Answer: Yes. Question: Did she seem to be having any movement with her hands? Answer: Yes, occasionally.'

"There were others that I can recite, other places in the deposition. Pages 95 and 96, she was cross-examined by Mr. Kelly, 'At the time you were in there, ten minutes earlier, that is, about 3:50 a.m., what position was Mrs. Fleming in at that time? Answer: She was still awake and working at

her restraints trying to get out of them. Question: Now, she had at that time already ripped through the vest, is that right, ma'am? Answer: Yes. Question: And so the restraint she was working on was her Posey at that time, is that right? Answer: Apparently. Question: Could you see what she was working on the Posey restraint with at that time? Answer: No, sir, because it was under — Question: Under her cover? Answer: Yes.'

"(The Court) I fail to see what you are driving at. If you are trying to point out certain differences in the testimony, you have succeeded in doing that, but you are far away from showing this is in any way an adverse witness.

"I might observe for the record that you are still treating this witness as if you had the witness on cross-examination and you were trying to discredit her, and it just isn't in the cards for you to do that to your own witness, to try to impeach your own witness.

"(Mr. Brooke) I'm trying to show the Court —

"(The Court) There's no showing she is adverse.

"(Mr. Brooke) Well, she is changing her testimony, and this is presently sworn testimony.

"(The Court) You don't have a change in the testimony. You ask two questions and you're back up here at the bench.

"(Mr. Brooke) The reason is she is changing her testimony each time I ask her a question.

"(The Court) I don't get that impression.

"(Mr. Brooke) I think, for the record, she was the only one there. They are the only ones and we don't have any independent witnesses.

"(The Court) Well, that's your problem, that's your burden. It is not the defendants' burden.

"(Mr. Farrington) I would like to go on the record myself, your Honor. Firstly, as far as the changing of testimony, on the incident report that is in

evidence as the plaintiffs' own testimony, which was placed there the night of the incident, indicates, which was written by Mrs. Decker, this witness, "We thought we had everything from her, including her purse.' . . .

\* \* \*

"(Mr. Farrington) Second thing I would like to put on the record is the plaintiff had every opportunity in this case to sue the individual — sue Mrs. Decker as an individual. That is his choice not to do that, not mine.

"At the present time I am in the capacity of representing Prince George's Hospital and which he has called a witness to testify against Prince George's General Hospital as his witness, and I object to him treating her as an adverse witness.

"(The Court) I would say so, too. Frankly, I find it totally unnecessary traipsing back and forth everytime a question or two is asked simply because there is some difference in the testimony."

At the conclusion of Mrs. Decker's testimony the record reflects:

"(Mr. Brooke) Your Honor, I think it might be appropriate if I make this motion now. I would like to proffer at this time in view of the last witness' testimony, in view of the fact she stated she was in charge of this wing, that she was a managing agent and did come in that category.

"Secondly, because of the fact that she changed her testimony from her prior sworn testimony that she is subject to cross-examination on these changes, and I would like to request the Court to permit me to read portions of her deposition to the jury. *I don't think there would be any harm if she didn't change it.* I think she should know what she testified to before.

"(The Court) Very well, deny the motion." (Emphasis added.)

The rule relative to impeaching one's own witness was stated for this Court by Judge Sybert in *Sellman v. State*, 232 Md. 344, 192 A. 2d 788 (1963):

> "Although the general rule is that a party may not impeach his own witness by proof of prior statements which are inconsistent with, or contradictory to, his testimony at the trial, it is well recognized in this State that where a party satisfies the court that he has been taken by surprise, and that the testimony is contrary to what he had a right to expect, it is within the sound discretion of the trial court to determine whether or not proof of prior inconsistent statements should be permitted. See *Bruce v. State*, 218 Md. 87, 145 A. 2d 428 (1958); *Meyerson v. State*, 181 Md. 105, 28 A. 2d 833 (1942); *Murphy v. State*, 120 Md. 229, 87 Atl. 811 (1913); and *Smith v. Briscoe*, 65 Md. 561, 5 Atl. 334 (1886). See also *Parker v. State*, 227 Md. 468, 177 A. 2d 426 (1962); 4 *Jones, Evidence* (5th ed.), §§ 941, 942; 58 Am. Jur., *Witnesses*, § 792; 4 U. Chi. L. Rev. 69. The right to prove prior inconsistent or contradictory statements is limited, however, to statements made to the party seeking to cross-examine the witness, or his attorney, or to some other person to be communicated to them, *Parker v. State, supra,* and the statement must involve material facts in the case. *Meyerson v. State, supra." Id.* at 348.

In *Green v. State*, 243 Md. 154, 220 A. 2d 544 (1966), Judge Oppenheimer quoted from *Sellman* and then said for the Court:

> "This exception to the general rule that a party will not be permitted to impeach the credibility of a witness he has called, is generally recognized and has been consistently followed in this State. Under the exception, if the witness has been called in

reliance upon a prior statement to the party calling him, the party who has called the witness to the stand will be allowed to show why he called him. The purpose of such showing, if a proper foundation has been laid, is to protect the party who put him on the stand. *Smith v. Briscoe*, 65 Md. 561, 569-70, 5 Atl. 334 (1886). Recourse to the right is confined to cases where the party calling the witness has been misled and surprised, or entrapped to his prejudice. *Bruce v. State*, 218 Md. 87, 94-95, 145 A. 2d 428 (1958).

"Before granting the privilege, the court should be satisfied that there has been surprise in the witness' testimony as to a material fact. *Smith v. Briscoe, supra* and *Bruce v. State, supra.*" *Id.* at 157.

Testimony is allowed in such cases, as put for the Court by Judge Horney in *Bruce v. State*, 218 Md. 87, 94-95, 145 A. 2d 428 (1958), "not for the purpose of discrediting the witness, but to contradict him and thereby afford the party calling him an opportunity to show why he called the witness."

In *Smith v. Briscoe*, 65 Md. 561, 5 A. 334 (1886), our predecessors said:

"[I]t is not every statement that may be made even to the party litigant or his attorney, that should be allowed to be contradicted by the party calling the witness. It should be left to the discretion of the Judge before whom the case is tried below to allow it to be done. The Court should be satisfied that the party has been taken by surprise, and that the evidence is contrary to what he had just cause to expect from the witness based upon his statements, and that such statements were about material facts in the case. It is not every light or trivial circumstance that would justify it." *Id.* at 569-70.

In *Bruce* Judge Horney cited *Travelers Ins. Co. v. Hermann*, 154 Md. 171, 179-80, 140 A. 64 (1928), where Judge Offutt said for the Court, after citing *Smith v. Briscoe, supra*, "[I]t

must appear too that the evidence of the witness is *prejudicial* to the party calling him, and it is not sufficient to show that it is not beneficial to him, or that it disappoints his expectations, even though justified." (Emphasis added.)

Matters concerning the nature and scope of cross-examination are within the sound discretion of the trial court. A ruling with reference to them will only be disturbed upon a showing of prejudicial abuse of discretion. *Nottingham Village v. Balto. County*, 266 Md. 339, 356, 292 A. 2d 680 (1972), citing *Smith v. Stinson*, 246 Md. 536, 541, 229 A. 2d 67 (1967); *Marlow, Infant v. Davis*, 227 Md. 204, 210-11, 176 A. 2d 215 (1961); and *Wilhelm v. Hadley*, 218 Md. 152, 158, 146 A. 2d 22 (1958). We find no abuse of that discretion here, particularly in the light of the concession by counsel for Fleming before the trial judge that he did not "think there would be any harm if [Mrs. Decker] didn't change [her testimony]." In fact, the case is reminiscent of *Travelers* where Judge Offutt said for the Court, 154 Md. at 180, "[H]e said nothing which could have hurt the appellant's case, but the most which could be said of his testimony was that it did not help it."

### b. Standards and Regulations for Certain Hospitals Promulgated by the State Department of Health and Mental Hygiene

Dr. Rosson, when called as a witness for Fleming, was asked on direct examination as to whether he was familiar with a book said by counsel to be "the regulation of the State Department of Health and Mental Hygiene governing the regulations of hospitals . . . ." He replied that he was "not familiar with its contents," was "not familiar with the source," and thus could not "attest to its authoritative qualities." The record extract tells us that in response to a question from the court as to what he proffered, counsel for Fleming said he "was ready to take the pages out and have them marked for identification," the pages being "185 and 186." They were not so marked and we have not the slightest idea from the record extract or from the record itself as to what was in them. Relative to the duty of litigants to print

as a part of the record extract such matters as we are expected to consider *see Federal Armored Express v. PSC,* 273 Md. 231, 241-42, 328 A. 2d 264 (1974), and cases there cited including *State Roads Comm. v. Sharper,* 231 Md. 411, 413, 190 A. 2d 647 (1963), and *Platt v. Wilson,* 191 Md. 371, 373, 62 A. 2d 191 (1948). We do not understand from the record that there was an attempt to place these pages in evidence. It goes without saying that trial judges are vested with wide discretion as to rulings on the relevancy of proffered evidence. From this record we are unable to establish any error in this ruling.

As a part of the attempt to qualify Dr. Hirsh as an expert he was asked whether there were any State regulations that covered the Hospital. He replied that there were. He was then handed a document which he identified as "a book entitled 'Maryland Agency Rules and Regulations, Title X, Department of Health and Mental Hygiene, Volume 1,'" saying "it [was] the regulations which have been promulgated by the State Department of Health and Mental Hygiene pursuant to its authority under Maryland law." When he was asked whether the regulations applied to all hospitals in Maryland, counsel for the Hospital asked leave to approach the bench. He pointed out that "[i]n neither the declaration nor in any of this discovery, particularly in Dr. Hirsh's case, the deposition, and what is written, there is no allegation whatsoever that the hospital failed to live up to any standards as far as meeting codes or regulations." Counsel claimed, "Whether or not he knows what the standards are in Maryland or read them or doesn't know them is irrelevant to qualify this witness as one who knows what the standards of what actually nurses do on duty in the hospital at that time, under those circumstances, and I suggest that this material is, once again, irrelevant and — absolutely irrelevant to qualify this doctor." The court asked what pages were proffered, whether it was the same two pages. Counsel for Fleming replied that he "hadn't even thought about this," that he "ha[d]n't gotten into that aspect," that what he was "doing . . . was qualifying what [Dr. Hirsh] knows about hospitals." We see no abuse of

discretion on the part of the trial court in ruling that the regulations were not relevant at that time. There can be no prejudice to Fleming insofar as that particular ruling is concerned since Dr. Hirsh was qualified as an expert. The regulations were not later proffered or offered into evidence.

### c. Medical Textbooks for the Purpose of Cross-Examination

Fleming contends that the trial "court erred in excluding evidence which should have been considered by the jury . . . ." He refers, among other things, to the exclusion of medical textbooks for the purpose of cross-examination. As a matter of actual fact, there were three books which Fleming attempted to use, *Harrison's Principles of Internal Medicine, Physicians' Desk Reference,* and the *Merck Manual.* Dr. Rosson acknowledged the first to be authoritative. Fleming's attorney then was permitted to read from that text in connection with his cross-examination of Dr. Rosson. When queried as to whether he regarded *Physicians' Desk Reference* as an authoritative document, Dr. Rosson stated that he did not, that he "th[ought] it [wa]s a list of information" which was "reliable to the extent that the Food and Drug Administration polices the standards upon which it is published." By reason of the statement by Dr. Rosson, Fleming was denied the right to use that text in cross-examination of Dr. Rosson. The *Merck Manual* was said by Dr. Rosson not to be "accepted as a major authority." No attempt appears to have been made to use it on cross-examination of Dr. Rosson after his refusal to accept it as authoritative.

Dr. Wilhelm said *Harrison's Principles of Internal Medicine* was authoritative. He was cross-examined relative to statements appearing in it. He refused to acknowledge either *Physicians' Desk Reference* or the *Merck Manual* as authoritative. He appears to have been cross-examined, however, relative to the former. There appears to have been no attempt to cross-examine Dr. Wilhelm relative to statements appearing in the *Merck Manual.*

Fleming says, "It is very clear that these textbooks were pertinent to the case." He sees a "danger in permitting a witness to shield himself from cross-examination by the use of a magic word," that is that he does not regard a work as "authoritative."

In *Nolan v. Dillon*, 261 Md. 516, 537, 276 A. 2d 36 (1971), Judge Singley commented for the Court relative to a refusal to admit into evidence certain medical journals, "It is well settled that medical books and treatises are not admissible as such, nor may they be used in the direct examination of experts, although their use is sanctioned in cross-examination." *Allison v. State*, 203 Md. 1, 6, 98 A. 2d 273 (1953), and *Eckels v. Cornell Economizer Co.*, 119 Md. 107, 114, 86 A. 38 (1912), both cited in *Nolan*, are to similar effect.

McCormick, *Law of Evidence* § 321 (2d ed. Cleary 1972) says relative to this problem:

"Virtually all courts do, to some extent, permit the use of learned materials in the cross-examination of an expert witness. Most courts would permit this use where the expert has relied upon the specific material in forming the opinion to which he testified on direct; some of these courts would extend the rule to situations in which the witness admits to having relied upon some general authorities although not that particular material sought to be used to impeach him. Other courts would require only that the witness himself acknowledge that the material sought to be used to impeach him is a recognized authority in his field; if he does so, the material may be used although the witness himself may not have relied upon it. Finally, some courts would permit this use without regard to the witness' having relied upon or acknowledged the authority of the source if the cross-examiner establishes the general authority of the material by any proof or by judicial notice. Traditionally, however, the material

may be considered only as going to the witness' competency or the accuracy of his conclusions, and may not be regarded as substantive evidence on the issues of the case." *Id.* at 743-44.

Rogers, *The Law of Expert Testimony* § 64 (3d ed. 1941) comments:

"Where a physician did not base his opinion on medical works, cross-examination as to whether he agreed with a medical author was improper unless he had first testified that he had read such author and regarded him as sufficiently authoritative." *Id.* at 124-25.

*See also* Annot., 60 A.L.R.2d 77 (1958).

We find no abuse of the broad discretion granted to a trial judge in ruling on the admissibility of evidence when he refuses, in a case such as this, to permit cross-examination of a physician by using treatises which the physician refuses to acknowledge as authoritative in the field.

### d. Life Tables

Counsel for Fleming attempted to read into the record from a certified copy of the life tables contained in the vital statistics of the United States as of 1970. Before he could quite complete the offer he was met with the request from counsel for Dr. Wilhelm to approach the bench. The attorney for the Hospital said that he "would not require the plaintiff to come in and try to bring people in here to prove the document." He contended, however, that the statistics contained in such life tables "are the normal, average people and the life tables for those normal average people," but that Mrs. Fleming was "a 67-year-old woman who went in the hospital with a bad lung problem and a bad heart problem." To this the trial judge added, "And a prediction of impending death, by her physician." Fleming's attorney suggested that the statistics were "collected from people from all walks of life and this is the average," that counsel could argue to the jury as to why Mrs. Fleming was not

average, but this did not go to the admissibility. The trial court held the introduction was "too premature at th[at] time." The life tables were not offered at a later time.

In *Baltimore & O.R.R. v. Whitacre*, 124 Md. 411, 92 A. 1060, *aff'd* 242 U. S. 169 (1915), exception was taken on appeal to the admission by the trial court "of the evidence of an insurance expert, in giving from his tables the value of an income, such as the plaintiff was receiving at the time of the accident." Judge Stockbridge said for the Court:

> "This evidence was of course intended as a guide for the jury in determining the proper amount of damages to be awarded. Without some evidence in regard to this before the jury, there was no basis except vague speculation on which to base any verdict. The insurance tables of expectancy, based upon actual experience of the large life insurance companies, while not conclusive, have been recognized to be the best character of evidence obtainable for such purposes, and the evidence objected to by these two exceptions was properly admitted." *Id.* at 430-31.

McCormick, *Law of Evidence* § 296 (1954), states, "In a few instances, certain books and reports of narrow scope do seem to be received as evidence of the truth of the matters cited. Among these are . . . mortality and annuity tables used by life insurance companies." However, he does not discuss the circumstances under which the tables may be used. *Rogers. op. cit.*, speaks to the point:

> "Standard mortality tables . . . are admissible in evidence, and the life expectancy estimates therein are proper evidence. Tables which are not standard and are not recognized authority are not admissible without proof of correctness.
>
> "Such tables are not conclusive as to the expectancy of life in a particular case, but are helpful in determining the probable duration of life in connection with other facts in the case.

Particular conditions affecting an individual, such as a hazardous occupation, or ill health, do not render the tables inadmissible but merely affect the weight of the evidence.

"The tables should be used in connection with expert testimony. A physician, an accountant familiar with the insurance business, and an insurance agent of long experience, have been permitted to testify as experts. The testimony must be based on the tables and not on the expert's observation and experience." *Id.* at 183.

On the subject of the use of such tables where poor health, injury, or hazardous occupation is involved, it is said in 29 Am. Jur. 2d *Evidence* § 898 (1967):

"Although there are some courts which take the position that mortality or life expectancy tables are inadmissible upon the life expectancy of a person who is not in average good health, it is generally not essential to the admissibility of such tables to show that the person whose expectancy of life is under consideration conforms to the standards of health and vigor adopted in compiling the tables. In most jurisdictions, standard mortality tables are admissible in evidence notwithstanding that the person whose life expectancy is the subject of inquiry is in poor health, afflicted with disease, or addicted to dissipated habits. Life tables have also been held to be competent evidence even though the person whose life expectancy is in inquiry is, or was, engaged in an extrahazardous occupation, or is not, or was not, an insurable risk. As has been suggested, mortality tables are only guides or suggestions to the matters they set out, and cannot be rejected because of sharp variances in the hazards of life among various persons. Such matters are generally considered as going to the probative effect of the evidence, and not to its admissibility. The authorities are in general

agreement that the probative value of the mortality tables may be weakened, and even, perhaps, in some cases destroyed, by evidence of the ill health or disease of the person whose life expectancy is in issue; such matters may properly be considered by the jury in weighing the testimony, but they do not render it incompetent." *Id.* at 1006.

The life tables should have been admitted.

> *Judgment reversed and case remanded for a new trial; costs to abide the result.*

*Murphy, C. J., concurring in part and dissenting in part:*

I agree with the majority that legally sufficient evidence was adduced at the trial to establish that Dr. Rosson failed to meet the standard of care for physicians enunciated in *Shilkret v. Annapolis Emergency Hosp.*, 276 Md. 187, 349 A. 2d 245 (1975), and that as a direct consequence Mrs. Fleming sustained injuries which resulted in her death. I cannot agree, however, after careful perusal of the expert testimony of Dr. Hirsh, that there was any evidence of negligence on the part of either Dr. Wilhelm or the Hospital nurses legally sufficient to go to the jury within the standards articulated in *Shilkret*, that could properly be found to constitute a proximate cause of Mrs. Fleming's death. I would, therefore, reverse the judgment entered in favor of Dr. Rosson and affirm the judgments in favor of Dr. Wilhelm and the Hospital.