# TIMOTHY CLYDE POOLE *v.* STATE OF MARYLAND

[No. 42, September Term, 1980.]

*Decided April 21, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*George E. Burns, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Deborah K. Handel* and *Stephen B. Caplis, Assistant Attorneys General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

Cole, J., delivered the opinion of the Court.

Because a specific type of impeachment testimony placed in evidence by the State over defendant's objection egregiously impaired his ability to present his defense, we shall, in this case, reverse the defendant's conviction for murder and set aside his sentence of death.

Timothy Clyde Poole was convicted of premeditated murder, felony murder, robbery with a dangerous weapon, and use of a handgun in a crime of violence by a jury in the Circuit Court for Calvert County. This same jury next sentenced him to suffer death. In addition to the death penalty, Poole was sentenced to life imprisonment, twenty years (concurrent), and fifteen years (consecutive). Because Poole was sentenced to die, all of his convictions and sentences are directly reviewable by this Court. Maryland Code (1957, 1976 Repl. Vol., 1980 Cum. Supp.), Article 27, § 414.

The parties have set forth the circumstances giving rise to the charges in the following statement of facts:

> David Creel, an eighteen year old student, was working at MacLarty's Pharmacy on the evening of October 22, 1979. According to Creel, at about eight o'clock that evening, two black men came into the store. One put a mask over his head as he walked down some steps to the backroom where Dr. David MacLarty was preparing prescriptions. The other (identified by Creel as Appellant) walked up to Creel who was behind a counter and pointed a shotgun at him. The man, not wearing a mask, told Creel to lock the front door. Creel walked to the front door with the gunman holding his belt and pointing the shotgun at his head.
>
> After the man watching Creel had closed and locked the front door, Creel heard two shots fired in the backroom. Dr. MacLarty said "Is there anyone

else out there?" The gunman ordered Creel to say no and then forced Creel to walk ahead of him into the backroom where they found the masked man (Steven Horad) lying on the floor breathing hard and with a head wound. Dr. MacLarty stood by the safe.

Creel's assailant stepped in front of him and shot MacLarty in the chest with a shotgun. MacLarty fell to the floor and lay there, having trouble breathing. Creel was ordered to get the money. The assailant picked up a gun lying beside MacLarty and pointed it at MacLarty's head. Creel said "You don't have to do that." The man, holding the gun an inch from MacLarty's face, pulled the trigger twice without result. Creel surrendered about $150 to the assailant who left the premises. Both MacLarty and Horad later died.

Mark Blob recalled that at about the time of the shooting he and some friends were sitting on a curb in the vicinity of MacLarty's when he noticed three black men drive slowly by in a "late '60's" silver Cadillac with a black vinyl roof. Blob remembered the incident because the men in the car were "looking at us, looking at us real hard." On March 25, 1979, Blob participated in a photographic identification procedure wherein he selected two photographs as looking "like" the men in the car. The photographs selected were of Appellant and David Brown (unrelated to this case). Blob identified Horad as the man sitting in the back seat.

Two address books were taken from Horad's pocket. In one of these, containing a hundred or so listings, was the name "Poole" with two telephone numbers.

When told of the shooting incident the next day, Appellant showed "no reaction whatsoever." Appellant also said that he had not seen Horad since the afternoon of the day of the shooting. Further, Appellant said that at the time of the shooting he

was with his girlfriend, Jennifer Lanier, and her roommate, Tamara White, at 3-H Neptune Court in Baltimore County.

At the time of the shooting Appellant was signed out of his residence at "Dismas House" on a six hour pass for 3-H Neptune Court.

Both Tamara White and Jennifer Lanier denied that Appellant had been at 3-H Neptune Court on the evening of the shooting. Lanier also testified that she knew that sometimes Appellant used her address as a "sign out" location but went other places. Lanier did not recall ever having seen Appellant operating an automobile. White, however, said she remembered having seen Appellant operating a large "darkish gray" car of undetermined vintage.

Yvonne Bethea testified for the defense. Bethea stated that on the evening of the shooting Appellant was at her residence at 1604 East Monument Street (about a "ten minute walk" from Dismas House) helping her with school work with which she was having difficulty. (Appellant was a student at Morgan State University at the time of the incident at MacLarty's Pharmacy.)

Poole has raised eight issues [1] in this appeal; however, because of the disposition we make of his fifth issue it will

---

[1]  1. Is the death penalty as promulgated in Maryland Code, Art. 27, Sec. 413 unconstitutional?

2. Did the trial judge err in refusing to take curative action after the prosecutor improperly commented on Appellant's impending failure to take the stand?

3. Was the evidence sufficient to justify Appellant's conviction of murder as a result of the death of his alleged accomplice?

4. Should the trial judge have granted a continuance to permit the police officer who had prepared the offense report to testify?

5. Did the trial judge err in permitting the State to impeach its own witness?

6. Did the trial judge err in permitting the State rebuttal argument in the sentencing phase of the proceedings?

7. Did the trial judge err in refusing to grant a continuance to permit the preparation of a presentence investigation report?

8. Did the trial judge err in permitting the prosecutor to make improper and prejudicial comments during the sentencing procedure?

be unnecessary for us to address any of the other issues in detail.

Poole contends the trial court committed reversible error in allowing the State to impeach its own witness, thereby prejudicing his defense and depriving him of a fair trial. He maintains the trial court permitted the State to violate the so-called witness "voucher" rule.

There exists in this State the general rule that a party who produces a witness in court vouches for that witness' credibility and trustworthiness, and no direct attack upon his veracity should be made by the producing party in the absence of surprise, hostility, or deceit. *Patterson v. State,* 275 Md. 563, 570, 342 A.2d 660 (1975); *Proctor Elec. Co. v. Zink,* 217 Md. 22, 32, 141 A.2d 721 (1958). Recourse to the right to impeach in such circumstances is strictly limited to those cases in which the party calling the witness has been misled and surprised, or entrapped, to his prejudice. *Fleming v. Prince George's County,* 277 Md. 655, 678, 358 A.2d 892 (1976); *Green v. State,* 243 Md. 154, 157, 220 A.2d 544 (1966); *Bruce v. State,* 218 Md. 87, 95, 145 A.2d 428 (1958). To avoid prejudice, a trial court may, in the exercise of its sound discretion, permit a party to impeach its own witness upon a showing (1) that the calling party is surprised; (2) that the witness' testimony is contrary to prior statements made by this witness to a party, his attorney, or a person to be communicated to them; and (3) that the statement involves facts material to the case. *Fleming v. Prince George's County, supra,* 277 Md. at 677; *Sellman v. State,* 232 Md. 344, 348, 192 A.2d 788 (1963). Central to the operation of the exception, however, is the element of prejudice. It is not sufficient to show that the evidence of the witness is not beneficial to the calling party, or that it disappoints his expectations, even though justified. *Fleming v. Prince George's County, supra,* 277 Md. at 678-79; *Travelers Ins. Co. v. Hermann,* 154 Md. 171, 179-80, 140 A. 64 (1928).

It is only when all of the above requirements have been met that the trial court, in its discretion, may allow the surprised and damaged party to examine the witness in

order to establish the fact that the witness has made a prior statement inconsistent with his present statement from the witness stand. Proof of the prior statement is permitted, not for the purpose of impeaching the general character of the witness, but rather to show why the party has called him. The purpose of this showing is to protect the party who has put him on the stand. *Fleming v. Prince George's County, supra,* 277 Md. at 678; *Green v. State, supra,* 243 Md. at 157; *Murphy v. State,* 120 Md. 229, 233, 87 A. 811 (1913); *Smith v. Briscoe,* 65 Md. 561, 568-69, 5 A. 334 (1886).

It is within this framework that the witness may be cross-examined by the calling party as to his prior contradictory statement, and, if the witness denies having made the statement, the calling party may offer independent proof thereof. *Patterson v. State, supra,* 275 Md. at 571; *State, use of Chenowith v. Balto. Contracting Co.,* 177 Md. 1, 15, 6 A.2d 625 (1939). Such proof, however, is not substantive evidence; its only evidentiary effect is to impeach the credibility of the witness. *Id.*

In the instant case, the determinative issue arose out of the following factual setting. The State established that on October 22, 1979, Poole signed out of Dismas House, the half-way correctional facility where he resided, and gave Lanier's address as his destination. The State produced Detective March who testified that Poole told him he was with Jennifer Lanier and Tamara White, at their house, on the night of the shooting. However, when White took the stand, she testified that Poole had not been there. Lanier, the State's final witness, also testified that Poole was not there the night Horad and MacLarty were shot.

Poole contended at trial (and the State's witness, Lanier, admitted) that it was common practice for him to sign out for Lanier's house when in fact his destination was elsewhere. Thus, when confronted by police the morning after the shooting, it may have been natural for him to say he was at Lanier's house so that his story would be consistent, not only for the police, but also for the officials at Dismas House.

However, Poole's alibi was *not* that he had been with Lanier the night of the shootings, but rather that he had been with Yvonne Bethea (his sole witness, upon whom he rested his entire defense) helping her with homework at her house. Yvonne Bethea so testified.

It is with this backdrop that we analyze the impact of the prosecution's examination of Jennifer Lanier, the State's final witness:

| | |
|---|---|
| Q. | What was your conversation with Timothy Clyde Poole the morning of October 23, 1979? |
| A. | Well, we just talked. |
| Q. | Talked about what? |
| A. | School and people. |
| Q. | Did you have a conversation concerning his whereabouts on the day prior, October 22, 1979? |
| A. | No. |
| Q. | Had you ever indicated to anyone that you had that conversation concerning his whereabouts? |
| A. | Yes. |
| Q. | What was that, any conversation that you indicated? |
| MR. CARDIN: | Objection. |
| COURT: | Overruled. |
| MR. ANDERS: | |
| Q. | Go ahead? |
| A. | I had told the Officer that he had told me to say he was there the night before. |
| Q. | Did you tell — |
| COURT: | Just a minute. Would you read the answer back, please, Mrs. Bates? The Jury didn't hear it. |

REPORTER: 'I told the Officer that he had told me to say he was there the night before.'

MR. ANDERS: May we approach the bench, Your Honor?

COURT: Yes, you may.

(Whereupon a conference at the bench is held with the defendant present and out of the presence of the Jury, and the following proceedings were had:)

MR. CARDIN: Your Honor, it would appear to me that the State is at this point trying to impeach his own witness. If that's what he is doing, I think it's incumbent upon the State to proffer to the Court that it is surprised, caught by surprise by the witness' testimony. Otherwise, I don't think it's proper for the State to impeach his own witness.

MR. ANDERS: Well, the State's in the position where this witness has given several stories concerning what has occurred, and I'm really calling her to explain which is true and why. I don't know that I'm attempting to impeach her. I'm not claiming surprise because whereas Mr. Cardin has heard stories that she's told, she is a necessary witness and I'm calling her to explain what occurred and what she said before and why.

COURT: Well, it seems to me in this case that although you may have had more than one story and Mr. Cardin objected, you didn't have

any choice but to ask the question, and then having asked it you now — the matter which is inconsistent apparently with the first statement given. I really don't think this amounts to anything other than to demonstrate to the Court that she is trying to help the defendant if she could —

MR. ANDERS: Beg your pardon?

COURT: I said I think it's pretty obvious to the Court that she is in a tough spot and it is certainly obvious to the Jury that she's in a tough spot. She apparently is trying to help the defendant if she can. It's only natural since they're boyfriend, girlfriend. To that extent I think you have demonstrated to the Court that you did have knowledge of another statement and she had said that she made other statements.

I sustained the objection that Mr. Cardin made when I thought he was right and I overruled it when I thought he was wrong. I don't think you're impeaching your witness by bringing out more than one story, which everybody knows.

(Whereupon the conference at the bench is concluded, and the following proceedings were had:)

MR. ANDERS:

Q. Jennifer, to clear this up, you indicated that you told the police originally that Timothy had come

Q. over to your house and asked you to tell the Police that he was at your house the night before, is that right?

A. Yes, sir.

Q. And he was not at your house before?

A. No.

Q. And your testimony today is that you just had a general conversation concerning what on October 23rd when he came over to your house?

A. School mostly, because I wasn't going to school that day.

We agree with Poole that, when the State elicited Lanier's prior statement, after her sworn testimony that she had never conversed with Poole about his whereabouts on the day of the shootings, this constituted impeachment. It is also apparent from this dialogue that the State was not surprised by Lanier's sworn testimony; in fact, surprise was expressly disclaimed. Equally clear is the basis for our conclusion that Lanier's in-court testimony was not prejudicial to the State's case. Lanier's "No," meaning that she had not conversed with Poole about his whereabouts, was simply not beneficial. The State had established all of the elements of its case; Lanier's "No," did nothing to advance or hinder it. In short, two of the prerequisites for invoking the exception to the voucher rule were absent.

Nevertheless, the State contends, Poole's statement to Lanier constituted an "admission by conduct," and as such, is not excludable as hearsay, but is independently admissible as substantive evidence. What the State overlooks is that it is not Poole's statement with which we are concerned. It is Lanier's prior, out-of-court statement which is at issue here. Thus, even if Lanier had been properly examined on direct, her prior, unsworn statement would not have been

admissible to prove the existence of Poole's statement, which was contained therein.

In *Green v. State, supra,* no error was found in allowing the State to impeach its own witness on the basis of surprise; however, treating the witness' prior inconsistent statement as having substantive value on the issue of the defendant's guilt or innocence was held to constitute prejudicial error. On this basis, Green's conviction was reversed. Thus, even where surprise is shown, "[p]rior statements produced at the trial to show the party calling the witness has been surprised by the witness' testimony, and why the witness was called, are not probative evidence on the merits and are not treated as having any substantive or independent testimonial value." 243 Md. at 158.

The State's rejoinder is that, in any event, Lanier's statement that Poole had told her to say that he had been at her house was harmless as merely cumulative to other evidence which tended to show that Poole was not with Lanier on the night of the shootings. We disagree. This statement is more than just cumulative to White's and Lanier's testimony; it cuts far deeper. This evidence permitted the jury to infer not only that Poole was not at Lanier's house, but also that he had done something that night, the fact of which he wanted to hide and for which he needed to invent an alibi. It permitted the jury to infer that Poole had no innocent explanation for his whereabouts — that he had gotten himself involved in some kind of serious trouble.

It is also apparent to us that Lanier's prior statement cast a shadow over the credibility of Yvonne Bethea. If the jury believed Poole attempted to persuade Lanier to lie, might not they also conclude that Bethea's testimony was perjured? Without Lanier's prior statement Poole had, at least, the opportunity to present to the jury a defense untainted by the suggestion that he had a propensity to tamper with witnesses. We find that the admission of Lanier's statement was fraught with prejudice. Because of this error, the judgments must be reversed and a new trial granted.

■■■■■■

While the disposition we make of Poole's fifth issue makes it unnecessary to address the other points raised, we believe that since a new trial must be had it will be of some guidance to the trial court to make two observations with respect to the sentencing phase of a capital case.

First of all, Article 23 of the Maryland Declaration of Rights provides:

> In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction.

This provision applies to the trial stage of the proceeding and refers explicitly to the evidence necessary to sustain a conviction. It does not apply to the jury's role in a sentencing proceeding. *See Stevenson v. State,* 289 Md. 167, 423 A.2d 558 (1980).

Secondly, we strongly discourage any comment by counsel in their arguments to the jury concerning appellate review of a death sentence. Such comments have no relevance to the jury's duty of determining the existence of the various aggravating and mitigating factors, and in deciding whether, upon balancing these factors, a death sentence should be imposed; rather, they tend to encourage the jury to believe that it can shift part of its responsibility to another body. We view such arguments as improper. *See Shoemaker v. State,* 228 Md. 462, 180 A.2d 682 (1962); *see also Moore v. State,* 240 Ga. 807, 243 S.E.2d 1, *cert. denied,* 439 U.S. 903, 99 S. Ct. 268, 58 L. Ed. 2d 249 (1978); *State v. Berry,* 391 So. 2d 406 (La. 1980); *State v. Jones,* 296 N.C. 495, 251 S.E.2d 425 (1979); *State v. Gilbert,* 273 S.C. 690, 258 S.E.2d 890 (1979).

> *Judgments of the Circuit Court for Calvert County reversed and case remanded to that court for a new trial.*