595 A.2d 448

**Damon Alejandro–Christopher BOWIE**

v.

**STATE of Maryland.**

**No. 132, Sept. Term, 1990.**

Court of Appeals of Maryland.

Sept. 11, 1991.

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender, Arthur A. DeLano, Jr., Asst. Public Defender, all on brief), Baltimore, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

**ROBERT M. BELL, Judge.**

Damon Alejandro–Christopher Bowie, appellant, was convicted by a jury in the Circuit Court for Prince George's County of two counts each of: first degree murder; attempted murder; assault with intent to murder; malicious shooting; and robbery with a deadly weapon. He was also convicted of related counts of use of a handgun in the commission of a felony or crime of violence. The State having timely given notice of its intention to seek the death penalty and/or imprisonment for life without the possibility of parole, *see* Maryland Code Ann. art. 27, § 412(b) (1957, 1987 Repl.Vol.1990 Cum.Supp.), appellant elected to be sentenced by the jury. Following a capital sentencing proceeding, the jury determined that a sentence of death should be imposed for each of the first degree murder convictions. Thereafter, the trial court imposed the death sentences and, in addition, sentenced appellant to additional terms of incarceration totaling 120 years.

On this appeal,[1] appellant presented 12 issues, of which we need address only four,[2] namely:

_____

**1.** Maryland Code Ann. art. 27, § 414 (1957, 1987 Repl.Vol.) provides:

(a) *Review by Court of Appeals required.*—Whenever the death penalty is imposed, and the judgment becomes final, the Court of Appeals shall review the sentence on the record.

$$* \quad * \quad * \quad * \quad * \quad *$$

(c) *Briefs and oral argument.*—Both the State and the defendant may submit briefs and present oral argument within the time provided by the Court.

**2.** The remaining issues raised by appellant are:

1. Did the trial court err in refusing to give a requested instruction on the missing witness rule?
2. Did the trial court err in refusing to permit the defense to impeach Harris' credibility with prior bad acts?
3. Should the court have granted Appellant's motion to suppress the extra-judicial and in-court identifications?
4. Did the court err in permitting the State to use its peremptory challenges in a racially discriminatory manner?
5. Did the court propound an incorrect instruction defining the concept of proof beyond a reasonable doubt?

1. Did the trial court err in refusing to propound *voir dire* questions designed to identify jurors who would give more weight to the testimony of police officers than civilians or to State's witnesses and defense witnesses?
2. Did the trial court err in refusing to propound a requested *voir dire* question relating to the possible racial bias of the prospective jurors?
3. Did the trial court conduct an inadequate jury selection procedure with respect to the views of the prospective jurors on the death penalty?
4. Did the trial court err in its sentencing-phase instructions to the jury? [3]

We will reverse and remand to the Circuit Court for Prince George's County for a new trial.

The issues we find dispositive of this appeal do not require a detailed recitation of the facts as developed in the trial below. It is, for our purposes, sufficient to note that appellant and James Edmonds, his accomplice, both armed with handguns, entered Stoney's Restaurant located on Old Branch Avenue in Prince George's County, Maryland and announced a robbery. Another accomplice, Darrell Thomas, acted as a lookout, remaining outside the restaurant on the parking lot. Yet another of appellant's companions, Shaun Harris, who testified on behalf of the State in return for use and derivative use immunity, was a short distance away,

---

6. Is Appellant entitled to reversal of two counts of malicious shooting and two counts of assault with intent to murder under the doctrine of merger?
7. Did the trial court err in refusing to sentence Appellant upon the non-capital convictions prior to the capital sentencing hearing?
8. Did appellant knowingly and intelligently elect to be sentenced by a jury?

3. Under this heading appellant challenges the appropriateness of the instructions given during the penalty stage, on reasonable doubt and concerning credit for good time. We do not address either. Appellant did not object to the reasonable doubt instruction; however, our resolution of the appeal provides the opportunity for him to do so on remand. As to the "good time" instruction, although not the precise issue, what we said in *Hunt v. State,* 321 Md. 387, 428–30, 583 A.2d 218, 238–39 (1990), may be instructive, should the issue again arise.

with Christian Bowie, appellant's sister, in the truck in which appellant was travelling. During the robbery, a bartender was forced into a back room and turned money over to Edmonds. Two other restaurant employees, Kevin Shelley, who was white, and Arnold Batson, who was African–American, were forced to lay face down on the floor. Each was fatally shot in the back of the head. The owner of the restaurant was shot in the arm and an off-duty Prince George's County police officer, Robert McDaniels, was shot in the face. Appellant was identified by McDaniels as the person who shot him in the face and held the gun to the back of Batson's head.

Additional facts will be supplied as they become relevant to the discussion of the issues.

1.

Among the questions that appellant submitted to the trial court for inclusion in its *voir dire* examination were the following:

1. Many of the State's witnesses will be police officers. Do you believe that a police officer will tell the truth merely because he or she is a police officer?

2. Would any of you be more or less likely to believe a police officer than a civilian witness, solely because he or she is a police officer?

3. Would any of you tend to view the testimony of witnesses called by the Defense with more skepticism than witnesses called by the State, merely because they were called by the Defense?

The court neither asked those questions, nor incorporated their substance into those it did ask, whereupon appellant objected. The objection was overruled. Appellant maintains that that ruling was prejudicial error, necessitating reversal and remand for a new trial.

The State recognizes that *"Langley v. State*, 281 Md. 337 [378 A.2d 1338] (1977), suggests that inquiry on this subject would have been appropriate under the circumstances such as those present here...." Nevertheless, it resists rever-

sal on three bases: (1) by failing to proffer the centrality of police testimony in the case at the time of *voir dire*, appellant failed, in effect, to preserve the trial court's refusal to propound the questions as an appellate issue; (2) appellant's failure to testify resulted in there being no "diametrically opposed" versions of events; therefore, no issue concerning the veracity of police testimony was presented and, consequently, appellant was not prejudiced; and (3) if error, it was harmless. Accordingly, the State maintains, appellant is not entitled to reversal on this ground.

In addition to McDaniels, who was a fact witness, the State's witness list indicated that it would, and the record reflects that it did, call other police officers to testify in their official capacity. In particular, the State called Prince George's County police officers and members of the Federal Bureau of Investigation to testify concerning various aspects of the investigation resulting in appellant's arrest. In addition to police personnel, the State also called the victims, all but one of whom—McDaniels—had no official position, and one of appellant's companions, Shaun Harris. Appellant did not testify, electing instead to call only two witnesses. One witness was the custodian of the records for the Prince George's Hospital Center, who testified concerning McDaniels' intoxication, providing his blood alcohol level. The other was a police officer, who testified concerning the make-up of the lineup in which appellant appeared. The critical issue in the case was appellant's criminal agency. Not surprisingly, therefore, appellant sought, through cross-examination, to discredit the State's witnesses and, thereby, establish the proverbial reasonable doubt.

While related, the three questions appellant requested were aimed at identifying two categories of venirepersons: (1) those who would believe police officers, simply because they were police officers, and (2) those who would prefer the testimony of State's witnesses over defense witnesses. In the first category, a further dichotomy is possible, between those who would simply believe police officers by

**8**

virtue of the position without regard to testimony from anyone else and those who would believe the police officers in comparison to civilian witnesses.

We deem *Langley* to be dispositive. There, the trial judge refused to propound, on *voir dire*, the following question proposed by the accused:

> Is there anyone here who would give more credit to the testimony of a police officer over that of a civilian, merely because of his status as a police officer?

281 Md. at 338, 378 A.2d at 1338. We reversed affirmance of the accused's conviction by the Court of Special Appeals, holding:

> [I]n a case such as this, where a principal part of the State's evidence is testimony of a police officer diametrically opposed to that of a defendant, it is prejudicial error to fail to propound a question such as that requested in this case.

*Langley*, 281 Md. at 349, 378 A.2d at 1344. We reasoned that, although the determination of what inquiry should be made of venirepersons concerning their eligibility to serve as jurors "is committed largely to the sound discretion of the trial court in each case,"

> [P]arties to an action triable before a jury have a *right* to have questions propounded to prospective jurors on their *voir dire*, which are directed to a specific cause for disqualification, and failure to allow such questions is an abuse of discretion constituting reversible error. (Emphasis in original)

*Casey v. Roman Catholic Arch.*, 217 Md. 595, 605, 143 A.2d 627, 631 (1958). We proceeded to make clear that the question requested fell within the subjects of inquiry aimed at excluding venirepersons not eligible for service as jurors. We said:

> A juror who states on *voir dire* that he would give more credit to the testimony of police officers than to other persons has prejudged an issue of credibility in the case. Regardless of his efforts to be impartial, a part of his

method for resolving controverted issues will be to give greater weight to the version of the prosecution, largely because of the official status of the witness. The argument by the State that police officers are entitled to greater credibility because they have less interest in the outcome of the case is not sufficient to overcome such an objection.

281 Md. at 348, 378 A.2d at 1343.

■ The State's argument is that a proffer was required to establish both that police testimony would be important to the State's case and that the testimony would be contradicted by "diametrically opposed" testimony.[4] It relies on language in *Langley* indicating that the scope of the *voir dire* into juror eligibility is largely discretionary with the trial court. *See Langley*, 281 Md. at 341, 378 A.2d at 1340. Other than that reference, the State cites no authority for the proposition. We are not persuaded. Even a cursory review of the *Langley* opinion reveals that the Court did not require a proffer as now urged by the State; indeed, the point was never addressed.[5]

Nor are we satisfied that the *Langley* holding applies only when a defendant takes the stand and testifies "dia-

---

**4.** At the conclusion of the *voir dire* examination, counsel for appellant excepted to the trial court's refusal to ask the proposed *voir dire* questions. Counsel did not proffer any facts to demonstrate why they should be asked and the court did not inquire. Indeed, the court cut counsel off when he was characterizing the questions to which he had referenced, only asking, "You object to my not having asked that?" When counsel responded, "yes," the court summarily stated, "Overruled." In addition, the court suggested:

Let's do this: First of all, the Court notes that the defendant's *voir dire* is filed on August 10th and is listed on the docket and now we will make reference to it without reading it into the record to save some time, and you are referring to page six, and which question under subparagraph witnesses?

**5.** A trial judge trying a criminal case can anticipate that one or more police witnesses will appear and testify. In any event, in this case one of the proposed *voir dire* questions contained a proffer of sorts; it advised the court that a number of police witnesses would testify, a fact that the State did not contradict.

metrically opposed" to the testimony of the police witnesses.[6] Consequently, we reject the State's alternative argument. The flaws in the State's argument are obvious. The first lies in its conclusion that credibility is an issue only when different versions of facts are specifically presented by opposing parties. In addition, and more critical, whether *voir dire* is proper is made to depend on hindsight—to require *voir dire* into police preference, the defendant must testify, and he or she must do so "diametrically opposed" to that of the police. The State would have a defendant in all cases put on a defense or fail in his or her effort to have the jury questioned concerning the question of police preference.

The State's burden is to prove the case against the defendant. The defendant has no burden at all. Where the issue is the defendant's criminal agency, the State must prove that agency by presenting witnesses, whose credibility ordinarily is necessarily at issue. And, in that situation, even though the defendant never takes the stand, crossexamination may suggest another version of facts, or, at least raise questions as to the accuracy, or veracity, of the testimony of the State's witnesses. Therefore, whether, or not, a defendant elects to take the stand or to present evidence at all, it is still necessary to determine whether witnesses called by the State will start with a "presumption of credibility" simply because of the positions occupied rather than the facts of the case. Certainly *Langley* does not specifically so hold; it just happens that in *Langley*, the defendant testified.

■ The State's final contention, that failure to inquire, if error, was harmless beyond a reasonable doubt, fares no better than its previous ones since it is based essentially on the arguments we have already rejected. We must add,

---

6. A different fact version is not dependent necessarily, on the defendant testifying, in any event. A defendant, who elects not to testify, may call fact witnesses to testify to a version of events different from that to which the State's witnesses testified.

however, that were the State correct with respect to the non-fact police witnesses (those who testified concerning the investigation of the crimes), the testimony of McDaniels (the fact witness) would remain an obstacle to a harmless error analysis. As to him, an issue of credibility was surely presented, namely, the reliability of his testimony. Moreover, to the extent that the State relies upon non-official witness testimony or the other police witnesses to corroborate McDaniels' testimony, it overlooks question No. 3. That question is designed to discover those who would give greater weight to the testimony of the witnesses whom the State calls. That would include both the non-official witnesses, *i.e.* the victims and accomplice, as well as the non-fact police witnesses.

In conclusion, we hold that the trial court erred in refusing to address in *voir dire* the issue raised by the three questions proposed by appellant and that the error was not harmless beyond a reasonable doubt. *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

### 2.

Appellant is an African–American and, with the exception of Batson, one of the murder victims, all of the victims and most of the State's witnesses were white. Accordingly, appellant requested the trial court to propound the following questions to the venirepersons:

1. Most of the victims in this case are white and Mr. Bowie and his alleged accomplices are black. Do you feel uncomfortable sitting on a jury where a black man is accused of shooting and robbing several white individuals?

2. Have you or any of your family been a member of any organization with a stated philosophy on race?

The trial court refused to propound the questions and appellant excepted. It is arguable that both of the proposed questions are defective; nevertheless, we hold that it was error for the trial court to refuse to propound any

questions designed to elicit the essence of the information appellant sought.

Simply because, in a non-capital case,[7] the victim of the crime is white and the defendant is African–American does not *constitutionally* require that questions into the venire-persons' racial prejudice must be propounded on *voir dire.* *Ristaino v. Ross,* 424 U.S. 589, 594–95, 96 S.Ct. 1017, 1020–21, 47 L.Ed.2d 258, 263 (1973). In that case, a State criminal trial of various crimes perpetrated by an African–American defendant against a white security guard, the trial court refused to propound to the venirepersons a question directed at racial prejudice. The Supreme Court affirmed, noting generally that the questions to be proposed during *voir dire* are largely discretionary with the trial court and "[t]hus, the State's obligation to the defendant to impanel an impartial jury generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant." *Id. See also Ham v. South Carolina,* 409 U.S. 524, 527–28, 93 S.Ct. 848, 850–51, 35 L.Ed.2d 46, 50–51 (1973); *Holmes v. State,* 65 Md.App. 428, 434–35, 501 A.2d 76, 79 (1985), *rev'd on other grounds,* 310 Md. 260, 528 A.2d 1279 (1987). On the other hand, the Supreme Court said:

> Although we hold that *voir dire* questioning directed to racial prejudice was not constitutionally required, the wiser course generally is to propound appropriate questions designed to identify racial prejudice if requested by the defendant.

> \* \* \* \* \* \*

> The States also are free to allow or require questions not demanded by the Constitution.

------

7. In *Turner v. Murray,* 476 U.S. 28, 36–37, 106 S.Ct. 1683, 1688, 90 L.Ed.2d 27, 37 (1986), the Supreme Court held that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias."

*Ristaino,* 424 U.S. at 597 n. 9, 96 S.Ct. at 1022 n. 9, 47 L.Ed.2d at 265 n. 9.

In Maryland, it is well-settled that interrogation of the venirepersons with respect to possible racial prejudice is required, on request, when racial prejudice may be a factor, given the facts of the case. *Humphreys v. State,* 227 Md. 115, 175 A.2d 777 (1961); *Contee v. State,* 223 Md. 575, 165 A.2d 889 (1960); *Brown v. State,* 220 Md. 29, 150 A.2d 895 (1959); *Holmes,* 65 Md.App. at 438–39, 501 A.2d at 81; *Tunstall & Alton v. State,* 12 Md.App. 723, 280 A.2d 275 (1971); *Smith & Nelson v. State,* 12 Md.App. 130, 277 A.2d 622 (1971). Moreover, neither a specific form of question nor procedure is required; it is only necessary that the essence of the information sought to be elicited is obtained. *See Contee,* 223 Md. at 579–81, 165 A.2d at 892–93.

In *Contee,* the *voir dire* questions submitted by the defendant were improper; "none was reasonably calculated to elicit or ascertain such bias or prejudice as would disqualify a prospective juror from rendering a fair and impartial verdict on the law and the evidence." 223 Md. at 580, 165 A.2d at 892. Nevertheless, we reversed, reasoning that when the lower court is made aware of the essence of what the defendant is seeking, it should either ask, on its own motion, "a proper question designed to ascertain the existence of cause for disqualification on account of racial bias or prejudice," 223 Md. at 580, 165 A.2d at 893, or give the defendant an opportunity to submit additional, proper *voir dire* questions. Otherwise, "a defendant is denied the opportunity of submitting or requesting proper questions relating to racial bias or prejudice to be propounded by the court to prospective jurors on *voir dire,* [and] such denial constitutes reversible error." 223 Md. at 581, 165 A.2d at 893.

We reversed the conviction of an African–American defendant, for shooting and killing a police officer, in *Brown,* because the trial court refused to propound questions designed to elicit the racial prejudice of the venirepersons

upon the defendant's request. 220 Md. at 34–36, 150 A.2d at 897–98. Noting that:

> The refusal to ask any questions as to the bias or prejudice which jurors might have as to a Negro, and as to whether the jury could give the defendant as fair and impartial a trial as they could a white man, falls into a different category [than questions regarding pre-trial publicity and jury connection with counsel], requiring more consideration,

*Id.* at 34, 150 A.2d at 897, we observed that "Unless bias is inquired into beforehand, its existence ordinarily will not become known since the verdict cannot be impeached." *Id.* at 36, 150 A.2d at 898. We also relied on *State v. Higgs*, 143 Conn. 138, 120 A.2d 152, 154–55 (1956), in which the Court said:

> We cannot be blind to the fact that there may still be some who are biased against the Negro race and would be more easily convinced of a Negro's guilt of the crime of rape than they would of a white man's guilt.... So long as race prejudice exists, even in a relatively few persons, there is a substantial chance that one of those few will appear in court as a venireman. Consequently, the fact that most people in the State are not prejudiced against Negroes is not of controlling importance.

*Contee* involved the alleged rape of a white woman by an African–American defendant. The venirepersons should have been questioned concerning racial bias, we noted, because the case was the type likely to cause "some racial feelings in the community where it is to be tried." 223 Md. at 580, 165 A.2d at 892. The same result was reached in *Humphreys*. There, we were again faced with the alleged rape of a white woman by an African–American man. We said:

> It is settled law in this State in a case where prejudice against the Negro race may be a factor in determining a prospective juror's attitude toward a particular defendant, the existence of such prejudice is a proper area of inquiry in the *voir dire* examination of the jurors....

Where such inquiry is sought on *voir dire* examination and the trial court refuses to ask questions of the jurors directed toward this end, we have held that this "failure to elicit from the jurors *the essence* of the information sought by the appellant was reversible error...." (Emphasis in original, citations omitted)

227 Md. at 118, 175 A.2d at 778.

The Court of Special Appeals has also addressed the issue. That court, in *Smith & Nelson, supra,* held that the trial court's refusal to ask the venirepersons about racial bias in that case, involving an armed robbery, was reversible error. In addition, the court refused to accept the geographical location in the state as a factor to be considered in the determination of the appropriateness of the question. Relying on *Smith & Nelson,* the Court of Special Appeals reached the same result in *Tunstall & Alton,* another armed robbery case. *Holmes* revisited the prior cases in order to determine what the requirement that there be special circumstances means. The *Holmes* court concluded:

Our review of the cases causes us to conclude that, in a criminal case, prejudice may be a factor because of the facts of the case when the complainant and the witnesses for the State are of a different race than the defendant, and the crime involves victimization of another person and the use of violence.

65 Md.App. at 438–39, 501 A.2d at 81.

■ Turning to the case *sub judice,* it is patent that the trial court erred in refusing to inquire concerning possible racial prejudice. All but one of the victims and most of the witnesses for the State were white. On the other hand, appellant is an African–American. Moreover, this case involves the violent victimization of other persons. Consequently, under our cases, inquiry into juror racial bias

should have been made.[8]

3.

The entire *voir dire* examination conducted by the trial court into the views of the venirepersons concerning the death penalty was:

Ladies and gentlemen, the State of Maryland has filed a request before the court that if found guilty, Mr. Damon Bowie be put to death. Is there any member of the prospective jury panel who has any feelings whatsoever about such a request, and I don't care which way you feel about it, that it would interfere with your ability to fairly and truly judge this matter based only on the evidence before the court?

Said another way, is there anybody in this room who has such feelings about the death penalty one way or the other that it would affect you emotionally or to the extent that it would override your ability to judge this matter based only on the evidence brought out in the courtroom and the instructions of the court to you and the application of that evidence to the law? If you have a positive response, please stand in place.

Those jurors who stood were excused for cause.

After the first prospective juror had been excused, appellant's counsel noted objection and asked to approach the bench, at which the following colloquy occurred:

MR. HELFAND [Appellant's Co–Counsel]: Your Honor, we object to the striking of that particular juror. I think it was No. 113.

THE COURT: It was indeed. Diane Wells.

---

**8.** The Supreme Court has held that failure to inquire into racial bias required vacation of only the death sentence, not a new trial. *Turner v. Murray, supra,* 476 U.S. at 37, 106 S.Ct. at 1688, 90 L.Ed.2d at 37. Relying on *Turner,* the State asserts that, if there was error in this case, only a new sentencing hearing is required. Appellant seeks a new trial. Because our holding is based on Maryland law, and not *Turner,* we will order a new trial.

MR. HELFAND: For the specific reason that, number one, we don't know what we think is her real opinion without a lot more questioning as to her feelings for or against the death penalty. We suggested in our voir dire a number of questions that we thought would—

THE COURT: What *voir dire*?

MR. SHEFFERMAN [Appellant's Co–Counsel]: It is filed. Do you want an extra copy?

MR. HELFAND: That's the State's.

MR. SHEFFERMAN: I have a clean copy if you want an extra one to work with.

MR. HELFAND: In addition to which, Your Honor, we object on the grounds that we believe that to ask each of these people this type of a question in public diminishes their real ability to respond, we believe when you have to do it in public, and that's why we asked that you individually call each one up that has any reservations so that we can hear what they have to say and each side have an opportunity, particularly our side, to discuss with them in your presence other questions which might with explanation make them a prospective juror.

THE COURT: You are saying that you want a chance to argue them out of their response that they cannot fairly and accurately try this case.

MR. HELFAND: Yes, I think—

THE COURT: Well, that is denied. You are entitled to a panel that can fairly and truly try this case. These people say they can't. I don't care what they think about the death penalty one way or the other. If they can't give a true and fair verdict in this case, they're not going to be available to you to choose as jurors.

MR. HELFAND: But what happens we are afraid of is that the most likely scenario is that people who have a fear of capital punishment are the people who most likely, we suggest to you, stand up and say that they cannot hear it because of a fear of capital punishment, which are precisely the very people that we would like to have an opportunity to, one, discuss the matter with in your

presence and, two, attempt to if necessary to hear an explanation about it. Maybe they have some different reasons, and perhaps even an opportunity to rehabilitate them if that's the correct phrase.

THE COURT: Madam State's Attorney.

MISS JOHNSTON [Assistant State's Attorney]: Your Honor, I think that the question the court has asked the panel is the appropriate question under the law. The court has elicited a positive response only from those people who feel that their opinions concerning the death penalty would prohibit them from being fair and impartial in this case. I would like the court to continue to proceed as the court has elected to.

THE COURT: I intend to. Your objections are noted and overruled.

Appellant argues that the *voir dire* question propounded by the trial court was both substantively and procedurally inadequate. It was substantively inadequate, he asserts, because it failed to identify, as required by *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the state of mind necessary to justify striking a venireperson for cause; it did not permit the court to determine whether the venirepersons could, despite their personal views on the subject, obey instructions given by the court. That deficiency could have been remedied, he argues, had the trial court followed his advice and asked follow-up questions focused on what the venirepersons really thought. The question was procedurally defective, appellant maintains, in that it was "too brief and superficial to meaningfully probe into the genuine beliefs of the jurors."

The most recent formulation of the standard to be utilized to determine whether a venireperson's views on capital punishment require exclusion of that person for cause is contained in *Witt, supra.* Before its pronouncement in that case, the Supreme Court had held "that a State may not constitutionally execute a death sentence imposed by a jury culled of all those who revealed during *voir dire* examina-

tion that they had conscientious scruples or were otherwise opposed to capital punishment." *Adams,* 448 U.S. at 43, 100 S.Ct. at 2525, 65 L.Ed.2d at 588, explicating *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 1776–77, 20 L.Ed.2d 776, 785 (1968); only if it is

> unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt,* (Emphasis in original)

would it be appropriate to exclude a venireperson. *Witherspoon,* 391 U.S. at 522–23 n. 21, 88 S.Ct. at 1776–77 n. 21, 20 L.Ed.2d at 785 n. 21.

The standard now is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt,* 469 U.S. at 424, 105 S.Ct. at 852, 83 L.Ed.2d at 851–52, quoting *Adams,* 448 U.S. at 45, 100 S.Ct. at 2526, 65 L.Ed.2d at 589. "This standard, essentially, is that jury impartiality requires only 'jurors who will conscientiously apply the law and find the facts.'" *Hunt v. State,* 321 Md. 387, 415, 583 A.2d 218, 231 (1990), quoting *Witt,* 469 U.S. at 423, 105 S.Ct. at 852, 83 L.Ed.2d at 851.

The Supreme Court has also addressed the nature of the trial court's decision-making when it applies the proper standard to the determination whether to exclude a particular venireperson. It concluded that "excluding prospective capital sentencing jurors because of their opposition to capital punishment is no different from excluding jurors for innumerable other reasons which result in bias...." *Witt,* 469 U.S. at 429, 105 S.Ct. at 855, 83 L.Ed.2d at 855. Thus, "[t]he trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appel-

late record." *Id.* To these factual findings, an appellate court must defer. *Id.*

As reported in *Witt*, 469 U.S. at 415–16, 105 S.Ct. at 848, 83 L.Ed.2d at 846, the decision to excuse a venireperson for cause was made after the following colloquy was had at the bench:

[Q. PROSECUTOR]: Now, let me ask you a question, ma'am. Do you have any religious beliefs or personal beliefs against the death penalty?

[A. COLBY]: I am afraid personally but not—

[Q] Speak up, please.

[A]: I am afraid of being a little personal, but definitely not religious.

[Q]: Now, would that interfere with you sitting as a juror in this case?

[A]: I am afraid it would.

[Q]: You are afraid it would?

[A]: Yes, sir.

[Q]: Would it interfere with judging the guilt or innocence of the Defendant in this case?

[A]: I think so.

[Q]: You think it would.

[A]: I think it would.

[Q]: Your Honor, I would move for cause at this point.

THE COURT: All right. Step down.

Applying the standard it had enunciated, the Court stated: "whatever ambiguity respondent may find in this record, we think that the trial court, aided as it undoubtedly was by its assessment of Colby's demeanor, was entitled to resolve it in favor of the State." 469 U.S. at 434, 105 S.Ct. at 857, 83 L.Ed.2d at 858. The trial court's finding of bias was, it concluded, fairly supported by the record. 469 U.S. at 435, 105 S.Ct. at 858, 83 L.Ed.2d at 858.

We applied *Witt* in *Grandison v. State*, 305 Md. 685, 506 A.2d 580, *cert. denied*, 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986), and *Hunt.* Review of those cases will, therefore, assist us in resolving the issue *sub judice.*

In *Grandison,* the defendant complained about the court's striking 23 of the 26 prospective jurors who expressed some hesitation in applying the death penalty, arguing "that it is clear that the court improperly struck these jurors because their beliefs were not such as to prevent them from rendering an impartial verdict." 305 Md. at 724, 506 A.2d at 599. Relying on the *Witt* standard, we rejected the defendant's challenge. In so doing, we acknowledged that deference must be given to the trial judge's decision to exclude a prospective juror for cause and, after quoting from the pertinent portion of *Witt, see Grandison,* 305 Md. at 725, 506 A.2d at 600, we explained:

> In our view, Judge Simpkins was painstakingly thorough in the questioning of prospective jurors, particularly those who obviously had problems with the death penalty in general. Furthermore, the trial judge afforded Grandison, his standby attorney, and the State's attorney ample opportunity to question the prospective jurors. In short, we are satisfied that the entire procedure was carefully executed in an effort to obtain a fair and impartial jury both as to the defendant and to the State.

*Id.* at 726, 506 A.2d at 600.

At issue in *Hunt* was the propriety of the trial court's rulings excluding, and refusing to exclude, prospective jurors for cause. Although the case involved the "reverse *Witherspoon*" situation—rather than expressing a predisposition *against* the death penalty, the prospective jurors at issue expressed a predisposition *in favor of* the death penalty—we again applied the *Witt* standard. *Hunt,* 321 Md. at 414, 415, 583 A.2d at 231. Once again, we noted the necessity of deferring to the trial judge's factual determinations regarding prospective juror bias. *Id.* That we believed the trial court's decisions were made "after a hearing on the merits," *Witt,* 469 U.S. at 430, 105 S.Ct. at 855, 83 L.Ed.2d at 855, was made clear by what we said when we addressed the individual prospective jurors who were excluded. We pointed out that counsel was given "a virtually unlimited opportunity to question the individual jurors on

their beliefs about the death penalty, as well as their beliefs about aggravating and mitigating circumstances" and that the "judge . . . made clear that his decision to grant or deny a motion to strike would be based upon the totality of responses given by that prospective juror." *Hunt,* 321 Md. at 415, 583 A.2d at 232. Our summary of the proceedings with respect to each of those prospective jurors confirmed that that procedure was followed; the trial court did not rule on exclusion until after the examination was complete. As to each prospective juror, we observed that there was no abuse of discretion by the trial court.[9] The trial court's ruling excluding the prospective juror, the record demonstrates, was also made after full consideration of the merits of that issue. *See Id.* at 419, 583 A.2d at 233–34.

What occurred in the instant case is in no way similar to what occurred in *Witt* or in our cases applying *Witt.* In those cases, the basis for the juror's conclusion and, therefore, for the court's ruling was apparent in the record. All

---

**9.** One of the five jurors, in *Hunt v. State,* 321 Md. 387, 583 A.2d 218 (1990), about whom appellant complained actually served on the jury. The proceedings as to that juror demonstrate quite clearly that the trial court determined not to exclude her after carefully considering the merits of the bias issue and that we deferred to the judge's conclusion:

> Void was certainly a confused juror. This does not mean that she should have been excused for cause. Void testified that she would vote for the death penalty in every case of murder, and every murder where a handgun was used to kill a police officer. But she then testified that she had already made up her mind to vote for a life sentence for Hunt, and would vote for a life sentence regardless of whatever information was provided during the course of the trial. She testified that it would make a difference to her that a handgun was used, but later testified that the weapon made no difference at all. She was also willing to consider many unenumerated mitigating circumstances, including evidence of prison conditions, drug use, and childhood abuse of the defendant. Ultimately, Void testified that she was willing to base her conclusion on the evidence and on the law as explained by the judge. This testimony supported the trial judge's decision to not exclude her for cause. It appears from the record that Mrs. Void was somewhat confused and often inconsistent but on balance, she was not predisposed to impose the death penalty.

*Hunt,* 321 Md. at 418–19, 583 A.2d at 233.

we have in this case is a trial judge's propounding of a question designed to elicit from prospective jurors *their* bottom line conclusion as to their ability to serve on a capital sentencing jury. Once the prospective jurors answered that question, *i.e.*, indicated that, because of an inclination for or against the death penalty, they could not impartially apply the law in accordance with the court's instructions, they were excluded without further inquiry, not even that requested by appellant, because it would have allowed the parties to "argue them out of their response that they cannot fairly and accurately try this case."

It is significant that the question asked was extremely broad; not only did it address both sides of the death penalty issue, but the answer to it did not provide any clue as to what caused, or causes, the prospective juror's predisposition. Moreover, the answer to the question did not reveal whether the attitude thus expressed would, or should, result in automatic disqualification. In other words, the mere answer to the question does not provide the trial judge with any meaningful information concerning juror bias on which to act, nor does it conclusively establish juror disqualification; here, the question gives no clue and, hence, does not make apparent the nature of the juror's apprehension or bias or indicates that automatic disqualification would be appropriate. Were we to endorse the procedure followed in this case, we would be ratifying the trial court's shifting to the prospective jurors, themselves, the responsibility to make the ultimate decision as to their ability to serve on a capital sentencing jury, thus, allowing the court to avoid the exercise of discretion.

 We hold that, where as here, the trial court excuses prospective jurors, whether for predisposition in favor of, or against, the death penalty, on the basis of broad questions calling for the jurors' bottom line conclusions, which do not in themselves reveal automatically disqualifying biases as to their ability fairly and accurately to decide the case, and, indeed, which do not elucidate the bases for those

conclusions, the trial court has not made a factual determination as contemplated by *Witt*, to which we must defer.[10]

## 4.

In addition to informing the jury of the meaning of life imprisonment without the possibility of parole, as it was required to do by *Bruce v. State*, 318 Md. 706, 732–35, 569 A.2d 1254, 1267–69 (1990), the trial court instructed the jury concerning parole and parole eligibility, as appellant requested, and the gubernatorial power to commute sentences, over appellant's objections. It instructed:

> A sentence of life imprisonment without possibility of parole means that Mr. Bowie will not be eligible to get parole for the balance of his natural life. Parole—in a moment I'll explain to you exactly what parole is. A sentence of life imprisonment with the possibility of parole, what I have earlier referred to as life, means that the Defendant, Mr. Bowie, will not be eligible to get parole until he has served at least 25 years in prison, less any credit for institutional good time that he may receive. At this point in time I believe, and I will stand corrected—this is relative—I think the maximum that one can earn in 25 years right now is something like a 4–year period. That would be the maximum. But the point is that under our law, life under the circumstances of this case means imprisonment without eligibility to make parole for a period of 25 years, less whatever the good time one can earn over that period.

> The Governor of the State of Maryland has the power to commute or change any sentence of death to a sentence of imprisonment for any period of time that he shall deem appropriate. Further, the Governor may pardon any per-

---

**10.** In the usual case, questions designed to elicit bottom line juror conclusions are often used in the *voir dire* process and actions taken by the court in response are appropriately upheld. In a death case, however, when they concern juror attitudes about the death penalty and whether a juror, because of those attitudes, will be able to serve, such questions are ordinarily inappropriate.

son convicted of a crime, including persons sentenced to life imprisonment without parole, on such conditions as he, the Governor, may prescribe or he may remit or reduce any part of the sentence of imprisonment without such remission operating as a full pardon. . . .

Let me, first of all, tell you what parole means. Interestingly enough, parole hearkens back to its original dictionary meaning of words. When one is in prison, one is asked to give their word that if let outside the place of imprisonment, the place of incarceration, and back into the community, one will then comport oneselves in accordance to society's rules and will not break parole. If they break parole, of course, they must go back within the wall of confinement. So parole doesn't mean that the sentence is suspended or the sentence is in any way abated. The sentence is being served, but it is being served outside a place of confinement.

* * * * * *

Pardon likewise is also the exclusive providence of the executive— . . . I read to you from the Constitution of the State of Maryland, Article 2, Section 20. It's entitled Power of Governor to Grant Reprieves and Pardons, Remit Fines and Forfeitures. He shall have the power to grant reprieves and pardons except in cases of impeachment and in cases in which he's prohibited by other articles of this Constitution, none of which I tell you apply to this case, and to remit fines and forfeitures for offenses against the State. But he shall not remit the principals or interest of any debt due the State except in cases of fines and forfeitures, and before granting nol pros or prosequi as it is correctly pronounced, or pardon, he shall give notice in one or more newspapers of the application made for it and of the day on or after which his decision will be given, and in every case in which he exercises this power he shall report to either the branch— either branch of the Legislature whenever required the petitions, recommendations and reasons which influenced his decision.

I read now from Article 41, Section 4–513. The Governor, upon giving notice required by the Constitution, may commute or change any sentence of death into penal confinement for such period as he shall think expedient and on giving such notice he may pardon any person convicted of a crime on such conditions as he may prescribe or he may upon like notice remit any part of the time for which any person may be sentenced to imprisonment on such like conditions without such remission operating as a full pardon.

I give you this definition of parole, these definitions of parole and pardon so that you can appreciate the full future implications of what you're being asked to decide. You will not, however, take from what I've just said or assume from what I've just said that Mr. Bowie will be either pardoned or paroled. There's nothing in the law that demands it. These are merely eligibilities. We would have you know the complete ramifications of what's being asked of you.

Appellant contends that giving the instructions on the commutation power was reversible error. He argues that such instructions "diminished the seriousness and finality of the jury's task. Clearly a jury would be more willing to take the awesome step of imposing a death sentence in the belief that any error they made was correctable by a higher authority than if they believed that they had the final word."

The State does not agree. In its view, the instructions did no more than inform the jurors as to how the criminal justice system operates in an area related to parole; as appellant sought an instruction concerning the meaning of "life without parole" and parole and parole eligibility, the jury was entitled to know the entire picture, *i.e.*, to be told about commutation, pardon, and credit for "good time." The State emphasizes that the instructions did not urge the jury to take its responsibilities less seriously because of the possibility of parole or pardon.

Until *Doering v. State,* 313 Md. 384, 545 A.2d 1281 (1988), our cases had uniformly held that, whether the subject was raised by the State, *Poole v. State, (Poole II)* 295 Md. 167, 453 A.2d 1218 (1983),[11] or by the defendant, *Harris v. State,* 312 Md. 225, 251, 539 A.2d 637, 649 (1988); *Booth v. State,* 306 Md. 172, 216–19, 507 A.2d 1098, 1120–22 (1986), *sentence vacated on other grounds,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987); *Bowers v. State,* 306 Md. 120, 150–53, 507 A.2d 1072, 1087–89, *cert. denied,* 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986); *Evans v. State,* 304 Md. 487, 529–30, 499 A.2d 1261, 1283 (1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986), parole was not a proper subject for jury consideration in a capital sentencing proceeding. The reasoning of the cases has differed, however.

The rationale underlying refusal to permit the prosecutor to argue to the capital sentencing jury concerning the possibility of parole was that such information might result in the jury shifting the ultimate burden of deciding a defendant's fate to the Parole Board and away from itself. *See Poole II,* 295 Md. at 196–97, 453 A.2d at 1233, in which we said:

> We believe this type of argument is likely to allow the jury to disregard its duty to determine aggravating and mitigating factors, and to then balance one against the other as required by ... Article 27, § 413, before imposing the death penalty. Any consideration of the possibility of parole as such simply is irrelevant and obviously prejudicial; we cannot condone such argument.

---

**11.** *Shoemaker v. State,* 228 Md. 462, 180 A.2d 682 (1962) also involved parole being injected in a criminal case by the prosecution, not, however, in the context of a capital sentencing procedure. The prosecutorial misconduct there condemned occurred during the guilt/innocence stage of trial; therefore, we said that it may have served "to suggest to the members of the jury that they might resolve any question of the defendant's guilt beyond a reasonable doubt with the thought that, even if they made a mistake, no great harm would be done since he might soon be paroled." *Id.,* at 469, 180 A.2d at 685.

Certainly, that is the underpinning of *Shoemaker v. State,* 228 Md. 462, 468–69, 180 A.2d 682, 685 (1962), the case upon which we principally relied to decide *Poole* II. Moreover, in *Poole v. State,* (*Poole* I), 290 Md. 114, 125, 428 A.2d 434, 440 (1981), we applied the same rationale to reject the State's argument that the availability of appellate review was a proper subject of argument at a capital sentencing proceeding.

Underlying our refusal to permit the defense to refer to parole is the rationale reflected in *Evans.* There, arguing its relevance to future dangerousness, the defendant sought to place evidence regarding his possible parole before the jury. We affirmed the trial court's rejection of the evidence, reasoning that "one might be likely to engage in criminal activity constituting a threat to those around him whether he is confined to a penal institution or is on parole." 304 Md. at 530, 499 A.2d at 1283. *See also Harris,* 312 Md. at 250–51, 539 A.2d at 649; *Booth,* 306 Md. at 217–18, 507 A.2d at 1121.

In *Doering,* one of the issues presented was the admissibility of evidence relating to the defendant's parole eligibility in the event he was sentenced to life imprisonment. 313 Md. at 407, 545 A.2d at 1292. Because the parole issue had not theretofore been presented in that context, *i.e.,* as "material to the question of the appropriateness of a life sentence, and therefore may operate as a mitigating circumstance", 313 Md. at 410, 545 A.2d at 1294, and the policy of the State was then to give "greater jury involvement in matters of parole where the jury determines the sentence," *id,* we took a fresh look at the parole issue and reappraised the factors bearing on it. *Id.* In so doing, we reiterated that the appropriateness of a sentence other than death may be considered a mitigating circumstance by the jury. 313 Md. at 411, 545 A.2d at 1294–1295. We also said:

> Maryland's death penalty statute is structured to give very broad discretion to the sentencing authority in determining the circumstances that will be deemed relevant to the ultimate question of whether death is the appropriate

penalty. We have said that "[i]f the sentencing authority perceives anything relating to the defendant or the crime which causes it to believe that death may not be appropriate, it may treat such factor as a mitigating circumstance and decide that it [is not outweighed by] the aggravating circumstances." ... Our statute permits the sentencing authority wide discretion to decline to impose the death penalty, but at the same time, it carefully channels and directs the consideration of factors that would permit its imposition. (Citations omitted)

*Id.*

We held "that where ... the defendant in a capital sentencing proceeding seeks to place before the jury relevant and competent information concerning his eligibility for parole in the event a life sentence is imposed, that request should be granted." *Id.* at 412, 545 A.2d at 1295. Thus, in *Doering,* we redrew the line with respect to what a jury in a capital sentencing proceeding may consider, by way of mitigating circumstances, to include parole eligibility should a sentence of life imprisonment be imposed. Subsequently, and consistently, we held, in *Bruce,* that a defendant is entitled, upon request, to an instruction defining life imprisonment without the possibility of parole,[12] explaining:

Without an appropriate instruction the jurors may not have understood that, as an alternative to the death penalty, they could impose a life sentence which would imprison the Appellant for the balance of his natural life. Had they been given a proper instruction on the meaning of "life without the possibility of parole," they may have

---

**12.** By enacting Chapter 237 of the Laws of 1987, codified at Maryland Code Ann. art. 27, §§ 412 and 413 (1957, 1987 Repl.Vol., 1990 Cum. Supp.) the Legislature provided the jury with another sentencing option—life imprisonment without the possibility of parole. It was this statute which formed the basis for the decision in *Bruce* and to which the *Doering* court had reference when it discussed the policy in favor of greater jury involvement with the parole issue.

concluded that this was adequate punishment and mitigated against the imposition of the death penalty.

318 Md. at 735, 569 A.2d at 1269.

 In the case *sub judice*, the trial court intended, by giving the pardon instruction, to complete the picture presented by the parole eligibility and life without parole instructions. And the court endeavored to ameliorate its effect by instructing the jury not to speculate that a pardon or parole would occur. Nevertheless, we are persuaded that giving the instruction was error.

 Life imprisonment without the possibility of parole is one of the sentencing options available to a sentencing jury. *See* Maryland Code Ann. art. 27, § 412 (1957, 1987 Repl.Vol, 1990 Cum.Supp.). An instruction defining that option has been, as we have seen, found appropriate because "[w]ithout some instruction by the judge, there is no reason to assume that the jury will know the sentence of life imprisonment without parole will mean that a defendant will be ineligible for parole for the balance of his natural life." *Bruce*, 318 Md. at 734–35, 569 A.2d at 1268. An instruction on parole eligibility is sanctioned, when requested by the defendant and generated by the evidence, because, such evidence, considered in connection with a sentence of life imprisonment, may be found by the jury to be a mitigating circumstance. *See Doering*, 313 Md. at 411, 545 A.2d at 1295.

Whether, and under what circumstances, the Governor may exercise his commutation or pardon powers, on the other hand, is neither a sentencing option nor a possible mitigating circumstance. In fact, we consider an instruction referring to such power to be subject to the same infirmities as the arguments made by the prosecutors in *Poole* II and *Poole* I: it invites the jury to undervalue its own responsibility for the penalty decision and directs the jury's attention away from those factors it must consider, *see* art. 27, § 413; *Poole* II, 295 Md. at 196–97, 453 A.2d at 1233. And, just as a reference to the appellate process may

be perceived by the jurors as shifting the ultimate burden away from themselves and to the appellate court, an instruction that the Governor has commutation powers may similarly be perceived. *Poole* I, 290 Md. at 125, 428 A.2d at 440. *See also People v. Morse*, 60 Cal.2d 631, 36 Cal.Rptr. 201, 212, 388 P.2d 33, 44 (1964),[13] in which an instruction informing the capital sentencing jury of the Governor's power to change its sentence was held to be subject to the same objection as a reference to the automatic appeal in death penalty cases. Moreover, and most important, there is nothing in art. 27 § 413, or in our cases, that suggests that such an instruction should be given. Finally, notwithstanding the trial court's admonition to the contrary, giving a pardon instruction may invite, rather than discourage, the jury to speculate on pardon eligibility, an issue not properly

---

**13.** Subsequently, as a result of a 1978 voter initiative, California law required trial judges to inform capital sentencing juries that a sentence of life imprisonment without the possibility of parole may be commuted by the Governor to a sentence that includes the possibility of parole. The question whether an instruction given pursuant to that law passed federal constitutional muster was before the Supreme Court in *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). That Court, contrary to the judgment of the California Supreme Court, *see People v. Ramos*, 30 Cal.3d 553, 180 Cal.Rptr. 266, 294, 639 P.2d 908, 936 (1982), held that the instruction met federal constitutional requirements, neither deflecting the jury from its mandated task, 463 U.S. at 1005–09, 103 S.Ct. at 3455–58, nor being too speculative a factor to be considered. 463 U.S. at 1001–12, 103 S.Ct. at 3453–59. On remand, the California Supreme Court held that the instruction was "incompatible with [the California Constitution's] guarantee of 'fundamental fairness' both because it is seriously and prejudicially misleading and because it invites the jury to be influenced by speculative and improper considerations," *People v. Ramos*, 37 Cal.3d 136, 207 Cal.Rptr. 800, 809–10, 689 P.2d 430, 439–40 (1984), a holding consistently followed by that Court. *See People v. Garrison*, 47 Cal.3d 746, 254 Cal.Rptr. 257, 283–85, 765 P.2d 419, 445–46 (1989); *People v. Johnson*, 47 Cal.3d 576, 253 Cal.Rptr. 710, 724–25, 764 P.2d 1087, 1101–02 (1988), *cert. denied*, 493 U.S. 829, 110 S.Ct. 98, 107 L.Ed.2d 62 (1989); *People v. Warren*, 45 Cal.3d 471, 247 Cal.Rptr. 172, 754 P.2d 218 (1988).

In its brief, the State directed our attention to a portion of the instruction the United States Supreme Court found inoffensive to the federal Constitution in *Ramos*. As should now be apparent, that instruction does not pass muster under Maryland law.

before it. Accordingly, the instruction should not have been given.

JUDGMENTS REVERSED AND CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR NEW TRIAL. COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.